IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | Civil No. 2:96 CV 095 RL |
| THE STATE OF INDIANA, STATE OF OHIO, ) | |
| and THE NORTHWEST AIR POLLUTION ) | Judge Rudy Lozano |
| AUTHORITY, WASHINGTON, ) | |
| ) | Magistrate Judge Rodovich |
| Plaintiff-Intervenors, ) | |
| ) | |
| v. ) | |
| ) | |
| BP EXPLORATION & OIL CO., et al., ) | |
| ) | |
| Defendants. ) | |

## SIXTH AMENDMENT TO CONSENT DECREE

WHEREAS, the United States of America (hereinafter "the United States"); the State of

Indiana, the State of Ohio, and the Northwest Pollution Control Authority of the State of

Washington (hereinafter "Plaintiff-Intervenors"); and BP Products North America Inc.

(successor in interest to BP Exploration and Oil, Co. and formerly known as Amoco Oil

Company, and hereinafter referred to as "BP Products"), and BP West Coast Products LLC (the

owner of refining assets previously owned by Atlantic Richfield Company) (hereinafter

collectively referred to as "BP") are parties to a Consent Decree entered by this Court on August

29, 2001 (hereinafter the "Consent Decree");

WHEREAS BP sold its Mandan and Salt Lake City Refineries to Tesoro Petroleum

Corporation (now known as Tesoro Corporation) ("Tesoro") on September 6, 2001, and Tesoro

1

assumed the obligations of the Consent Decree as they relate to the Mandan and Salt Lake City
Refineries pursuant to the First Amendment To Consent Decree, which was approved and
entered as a final order of the Court on October 2, 2001;

WHEREAS, BP sold its Yorktown Refinery to Giant Yorktown, Inc. ("Giant") on May
14, 2002, and Giant assumed the obligations of the Consent Decree as they relate to the
Yorktown Refinery pursuant to the Second Amendment of the Consent Decree, which was
approved and entered as a final order of the Court on June 7, 2002;

WHEREAS, BP sold a hydrogen plant located at its Texas City Refinery to Praxair on
August 6, 2004 and Praxair assumed the obligations of the Consent Decree as they relate to that
hydrogen plant pursuant to the Third Amendment of the Consent Decree, which was approved
and entered as a final order of the Court on October 25, 2004;

WHEREAS a Fourth Amendment to the Consent Decree was entered by the Court on
June 20, 2005, establishing, *inter alia*, final $SO_2$ and NOx emission limits for a number of
FCCUs owned and operated by BP;

WHEREAS, a Fifth Amendment to the Consent Decree was entered by the Court on
February 22, 2007, requiring, *inter alia*, Tesoro to install certain NOx controls on the Mandan
FCCU/CO Furnace;

WHEREAS, the United States Environmental Protection Agency ("EPA") conducted an
inspection of BP Products' Texas City Facility in May and August of 2005. This inspection
identified, *inter alia*, numerous violations of the requirements of:

1.    Paragraph 19.A.i. (Facility Current Compliance Status) of the Consent Decree
      regarding the "Benzene Waste Operations NESHAP";

2

2.    The National Emission Standard for Hazardous Air Pollutants for Benzene Waste Operations promulgated at 40 C.F.R. Part 61, subpart FF, pursuant to Section 112 of the Clean Air Act, 42 U.S.C. § 7412 (the "Benzene Waste Operations NESHAP");

3.    The Recycling and Emissions Reduction Regulations for Refrigerants promulgated at 40 C.F.R. Part 82, subpart F, pursuant to Subchapter VI of the Clean Air Act ("Stratospheric Ozone Protection"), 42 U.S.C. §§ 7671 – 7671q; and

4.    The National Emission Standard for Hazardous Air Pollutants for Asbestos promulgated at 40 C.F.R. Part 61, subpart M, pursuant to Section 112 of the Clean Air Act, 42 U.S.C. § 7412 (the "Asbestos NESHAP");

WHEREAS, a supplemental complaint has been filed concurrently with the lodging of the Sixth Amendment to the Consent Decree regarding the Benzene Waste Operations NESHAP, Stratospheric Ozone Protection, and Asbestos NESHAP claims described above;

WHEREAS, a comprehensive program of injunctive relief is necessary to manage and control benzene wastes, ozone depleting substances, and asbestos-containing materials at the Texas City Facility in order to protect public health, welfare, and the environment;

WHEREAS, BP Products has agreed to pay a civil penalty to resolve the violations described above;

WHEREAS, BP Products has commenced implementation of corrective measures at its Texas City Facility to resolve the violations described above, and shall continue these actions;

WHEREAS, Paragraphs 53 and 74 of the Consent Decree preserve the United States'

right to pursue remedies, including additional injunctive relief, to resolve BP Products' violations of the Consent Decree;

WHEREAS, pursuant to Paragraph 64 of the Consent Decree, this Court has retained jurisdiction of this matter for the purposes of implementing and enforcing the terms and conditions of the Consent Decree;

WHEREAS, BP Products does not contest this Court's jurisdiction to enforce the terms and conditions of the Consent Decree, and to enter and enforce this Sixth Amendment;

WHEREAS, Paragraph 85 of the Consent Decree requires that this Sixth Amendment be approved by the Court before it is effective;

WHEREAS, the Sixth Amendment to the Consent Decree only applies to and affects requirements of the Consent Decree that pertain to the Texas City Facility;

WHEREAS, the Sixth Amendment to the Consent Decree does not affect the interest of any of the parties to the Consent Decree other than the United States and BP Products; and

WHEREAS, the United States and BP Products recognize, and the Court by entering this Sixth Amendment to the Consent Decree finds, that this Sixth Amendment to the Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties, and that this Sixth Amendment to the Consent Decree is fair, reasonable, and in the public interest;

NOW THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law, except as provided in Section I of the Consent Decree ("Jurisdiction and Venue"), and with the consent of the United States and BP Products,

IT IS HEREBY ADJUDGED, ORDERED, AND DECREED that the Consent Decree shall be amended in accordance with this Sixth Amendment as follows:

## I.  **APPLICABILITY**

**1.** The provisions of this Sixth Amendment shall apply to, and be binding upon BP Products with respect to its Texas City Facility in accordance with the requirements of Section II, Paragraphs 6-10 of the Consent Decree.

## II.  **OBJECTIVES**

**2.** In addition to furthering the objectives of the Clean Air Act as set forth in Section III, Paragraph 11 of the Consent Decree, the Parties enter into this Sixth Amendment with the further objective to perform the actions described below and all other necessary steps to: a) achieve, maintain, and ensure the Texas City Facility's compliance with all requirements of the Consent Decree and its subsequent amendments regarding the Benzene Waste Operations NESHAP; b) eliminate or minimize future and mitigate past emissions of benzene from the Texas City Facility; c) eliminate or minimize the emission of Ozone Depleting Substances (referred to as "ODS" and defined in Paragraph 13 of this Sixth Amendment) from the Texas City Facility's industrial and comfort cooling appliances; and d) ensure that Asbestos-Containing Materials (referred to as "ACM" and defined in Paragraph 14 of this Sixth Amendment) at the Texas City Facility are identified, managed, handled, and disposed of properly so as to minimize the emission of asbestos into the ambient air.

## III.  **DEFINITIONS**

**3.** In addition to the provisions of and definitions contained in Section IV of the Consent Decree, the following definitions shall apply to this Sixth Amendment to the Consent Decree:

> a.  "Aqueous Benzene Wastes" shall mean facility wastes (including remediation and process turnaround waste) with a flow-weighted annual average water content of 10% or greater, on a volume basis as total water, or any waste stream that is

mixed with water or wastes at any time such that the resulting mixture has an annual water content of 10% or greater;

b. "Benzene Waste Operations NESHAP" shall mean the regulatory requirements of the National Emission Standard for Hazardous Air Pollutants for Benzene Waste Operations promulgated at 40 C.F.R. Part 61, subpart FF, pursuant to Section 112 of the Clean Air Act, 42 U.S.C. § 7412;

c. "BP Products" shall mean the Defendant, BP Products North America Inc., successor in interest to BP Exploration and Oil, Co. and f/k/a Amoco Oil Company;

d. "Cooling Tower System" shall mean closed loop recirculation systems, "once-through" systems, or any other cooling tower system that receives non-contact process water from a heat exchanger for the purposes of cooling the process water prior to returning the water to the heat exchanger or discharging the water to another process unit, waste management unit, or to a receiving waterbody;

e. "Cooling Tower System Return Line(s)" shall mean the main water trunk lines at the inlet to the cooling tower;

f. "Date of Lodging of the Sixth Amendment" shall mean the date this Sixth Amendment to the Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Northern District of Indiana;

g. "Date of Entry of the Sixth Amendment" shall mean the date this Sixth Amendment to the Consent Decree is approved and/or signed by the United States District Court Judge;

h. "Day" shall mean a calendar day starting at 12 a.m. and ending twenty-four (24) hours later at 12 a.m. (*i.e.*, midnight);

i. "Defendant" shall mean BP Products;

j. "Effective Date of the Sixth Amendment" shall have the definition provided in Section XVIII of the Sixth Amendment;

k. "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

l. "Highly Reactive Volatile Organic Compound(s)" or "HRVOC(s)" shall mean the following compounds: Ethylene; Propylene; 1,3-Butadiene; 1-Butene; Cis-2-Butene; and Trans-2-Butene. BP Products may submit a request to EPA to remove and/or add compounds defined as HRVOCs under the Sixth Amendment. This request shall be subject to EPA approval in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended;

m. "Leak" shall mean, for purposes of the Cooling Tower Water Monitoring and Repair Program set forth in sub-paragraph 19.W., any leak with a potential benzene mass leak rate of ten (10) pounds per day (lbs/day) or greater as determined by sub-paragraph 19.W.iii.b.;

n. "LEAK" shall mean, solely for purposes of sub-paragraph 19.W.iv.a of the Cooling Tower Water Monitoring and Repair Program, the mass leak rate of VOCs and NOx as determined by the monthly monitoring required by sub-paragraph 19.W.iii. and any additional Leak monitoring conducted by BP Products in accordance with sub-paragraph 19.W.iii.;

o. "Organic Benzene Wastes" shall mean facility wastes (including remediation and process turnaround waste) with a flow-weighted annual average water content of less than 10%;

p. "Parties" shall mean the United States and BP Products;

q. "Root Cause Failure Analysis", as used in this Sixth Amendment, shall mean a process of analysis and investigation to determine the primary cause(s) for exceedances of the 1 Mg quarterly or 4 Mg annual benchmarks for uncontrolled benzene wastes. Specific requirements for undertaking a Root Cause Failure Analysis are set forth within sub-paragraph 19.V.iv.a. of the Sixth Amendment;

r. "Sixth Amendment" or "Sixth Amendment to the Consent Decree" shall mean this document including any and all appendices attached hereto. In the event of conflict between this Sixth Amendment and any appendix, this Sixth Amendment shall control. Furthermore, in the event of conflict between a specific requirement of this Sixth Amendment and the Consent Decree, this Sixth Amendment shall control;

s. "Texas City Facility" shall mean the petroleum refining facility and associated operations located at 2401 5th Avenue South in Texas City, Texas that is owned and operated by BP Products as of the Date of Entry of the Sixth Amendment; and

t. "United States" shall mean the United States of America, acting on behalf of EPA.

8

## IV. AFFIRMATIVE RELIEF/ENVIRONMENTAL PROJECTS (OR MEASURES)

**4. Section V (Affirmative Relief/Environmental Projects (or Measures)), Paragraph 19 (Benzene Waste NESHAP), sub-paragraph 19.A (Facility Current Compliance Status)** of the Consent Decree is amended by adding the following new sub-paragraphs 19.A.iii. and 19.A.iv. at the end thereof:

19.A.iii. For the 2008 calendar year and continuing thereafter, the Texas City Facility shall comply with the compliance option set forth at 40 C.F.R. § 61.342(e) (the "6 BQ Option" or "6 Mg Option"), along with all other associated requirements of the Benzene Waste Operations NESHAP, in lieu of the 2 Mg compliance option currently required under sub-paragraph 19.A.i. of the Consent Decree. In lieu of the timeline for compliance originally required under sub-paragraph 19.N of the Consent Decree, for the 2008 calendar year and continuing thereafter, the Texas City Facility shall comply with the quarterly "End of the Line" ("EOL") sampling requirements for facilities operating under the 6 BQ Option contained in sub-paragraph 19.N, as amended. In lieu of the timeline for compliance originally provided for under sub-paragraph 19.V of the Consent Decree, beginning with the first full Calendar Quarter after the Date of Entry of the Sixth Amendment, and continuing thereafter, the Texas City Facility shall comply with the reporting requirements contained in sub-paragraph 19.V., as amended. Beginning on April 1, 2009 for the calendar year 2008 TAB report and continuing thereafter on or before each April 1st, BP shall submit its annual TAB report for the preceding calendar year required pursuant to 40 C.F.R. § 61.357(d)(2).

a. 4 Mg Operational Benchmark. No later than January 1, 2009 and continuing thereafter, BP Products shall operate the Texas City Facility with the

9

goal of meeting annual and quarterly benchmarks for controlling benzene wastes at the Texas City Facility that are at least 33% more stringent than required under the 6 Mg Option. Specifically, BP Products shall operate the Texas City Facility in accordance with all applicable methods and procedures under the Benzene Waste Operations NESHAP for determining compliance with the 6 Mg Option, but with the further goal of limiting uncontrolled Aqueous Benzene Wastes as described in 40 C.F.R. § 61.342(e)(2) to an amount no greater than 4 Mg/year (4.4 tons/year) (the "4 Mg Operational Benchmark"). Except as specifically provided in sub-paragraphs 19.V.iii.a. and 19.V.iv.a. *infra*, for purposes of determining compliance with the requirements of the Consent Decree, as amended by this Sixth Amendment, and the Benzene Waste Operations NESHAP, the Texas City Facility's compliance shall be determined in accordance with the requirements of the 6 Mg Option.

19.A.iv. Control of Organic and Aqueous Benzene Wastes.

a. Organic Benzene Wastes. No later than the Date of Entry of the Sixth Amendment, BP Products shall ensure that waste management units at the Texas City Facility handling Organic Benzene Wastes are in compliance with all standards applicable to such waste management units under the Benzene Waste Operations NESHAP.

b. Aqueous Benzene Wastes. For purposes of complying with the 6 Mg Option, all waste management units at the Texas City Facility handling Aqueous Benzene Wastes shall either: (1) meet the applicable control standards of the Benzene Waste Operations NESHAP, or (2) have their uncontrolled benzene

10

quantity count toward the 6 Mg compliance limit. Nothing in this sub-paragraph shall be construed to limit the ability of BP Products to treat and manage Aqueous Benzene Wastes in accordance with the requirements of 40 C.F.R. § 61.355(k)(4).

**5. Sub-paragraph 19.D (Waste Stream Audits)** of the Consent Decree is amended by adding the following new sub-paragraphs 19.D.i.-19.D.v. at the end thereof:

19.D.i. <u>Review and Verification Audit</u>. In addition to the requirements of sub-paragraphs 19.D. and 19.E. of the Consent Decree, by no later than January 1, 2009 or the Date of Entry of the Sixth Amendment, whichever is later, BP Products shall complete an independent third-party audit ("Review and Verification Audit") to, at a minimum, review and verify the completeness of the Texas City Facility's benzene waste stream inventory for the purpose of ensuring future compliance with the TAB reporting requirements of 40 C.F.R. 61.357(d) and the 6 Mg Option. The Review and Verification Audit may be fulfilled by the ongoing waste stream audit at the Texas City Facility initiated by Sage Environmental Consulting on or about September 2006 provided that those activities will otherwise fulfill the requirements of this sub-paragraph. The Review and Verification Audit shall:

- a. Identify, through field verification and to the maximum extent practicable field observation, the point of generation for each waste stream at the Texas City Facility required to be included in the facility's TAB;
- b. Review, analyze, and verify the calculations and measurements used to determine the following characteristics of each waste stream identified

11

in accordance with sub-paragraph 19.D.i.a. above to ensure their

accuracy:

    1)  the water content of the waste stream;

    2)  the flow-weighted benzene concentration (expressed as parts per million by weight - "ppmw");

    3)  the flow and/or total annual benzene waste quantity (expressed in Mg/year);

    4)  the annual aqueous and organic waste quantities (expressed in Mg/year); and

    5)  the range of benzene concentrations (expressed in upper and lower ppmw limits).

c.  The review and verification of the calculations and measurements listed in sub-paragraph 19.D.i.b. shall be based upon the most current and representative analytical data, documented knowledge, and/or new analytical testing (conducted in accordance with 40 C.F.R. § 61.355 and all other applicable requirements) of the waste streams;

d.  Review and verify that each waste stream is properly included and accounted for in the Texas City Facility's annual TAB reports;

e.  Review and verify that each waste stream identified is controlled or accounted for as uncontrolled in accordance with the requirements of the Benzene Waste Operations NESHAP and the 6 Mg Option; and

f.  Identify any deficiencies and/or non-compliance in the Texas City Facility's benzene waste stream inventory and its 2006 TAB submittal with the requirements of the Benzene Waste Operations NESHAP.

19.D.ii. Benzene Waste Stream Review and Verification Report. By no later than February 1, 2009 or thirty (30) Days following the Date of Entry of the Sixth Amendment, whichever is later, BP Products shall submit a report ("Benzene Waste Stream Review and Verification Report") to EPA that sets forth the results and findings of the Review and Verification Audit requirements identified in sub-paragraph 19.D.i.

19.D.iii. Review and Verification Corrective Action Plan. If the results of the Review and Verification Audit indicate that the Texas City Facility is not in compliance with the 6 Mg Option as of the date of completing the audit, then BP Products shall submit to EPA, by no later than May 1, 2009 or 90 Days after the Date of Entry of the Sixth Amendment, whichever is later, a corrective action plan ("Review and Verification Corrective Action Plan") that identifies the specific compliance strategy, corrective actions, and schedule that BP Products will implement to ensure that the Texas City Facility complies with the 6 Mg Option as soon as practicable. This Review and Verification Corrective Action Plan shall be subject to EPA comment in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended. BP Products shall implement the Review and Verification Corrective Action Plan pursuant to its proposed schedule by no later than 60 Days after submission to EPA. If EPA does not submit comments to BP Products within the 60-Day period for implementation, the Review and Verification Corrective Action Plan and schedule remain subject to EPA comment in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended.

19.D.iv. Amended TAB Reports. If the results of the Review and Verification Audit indicate that the Texas City Facility's 2007 TAB report does not accurately reflect the TAB calculation for the Texas City Facility, then by no later than April 1, 2009 or

ninety (90) Days after the Date of Entry of the Sixth Amendment, whichever is later, BP

Products shall submit to EPA an amended TAB report that corrects all such inaccuracies.

> 19.D.v.  Waste Management Units and Streams - Future Identification or
> Creation.

At any time prior to the termination of the requirements of Paragraph 19 of the

Consent Decree as amended by the Sixth Amendment, if BP Products: (a) identifies a

waste management unit in benzene waste service or a waste stream with a benzene

quantity of 0.05 Mg/year or greater at the Texas City Facility that is uncontrolled for

purposes of the Benzene Waste Operations NESHAP, despite being previously

designated as a controlled unit or waste stream; or (b) creates a benzene waste stream

with a benzene quantity of 0.05 Mg/year or greater at the Texas City Facility that is

managed and/or treated in any uncontrolled portion of an individual drain system or the

wastewater treatment system, then BP Products shall include the following information

within the first semi-annual EOL Report required under sub-paragraph 19.V., as amended

herein, after the new waste stream is created or identified:

> a.  A description of each waste management unit(s) or waste stream(s)
> identified or created;
>
> b.  A detailed control plan describing the corrective actions, if any, that
> BP Products has taken or shall take to comply with the requirements of
> 40 C.F.R. § 61.342(e); and
>
> c.  A schedule for completing such corrective actions and achieving such
> compliance, unless corrective actions are completed and compliance
> has already been achieved before BP Products is required to submit the
> semi-annual EOL Report.

14

Control device failures or malfunctions will not be deemed to constitute the identification or creation of a new waste management unit or new benzene waste stream for purposes of this sub-paragraph 19.D.v. unless repairs are not completed in accordance with applicable requirements. However, downtime must be recorded and reported as applicable to the control device in accordance with the provisions of the Benzene Waste Operations NESHAP. Any control plan and schedule submitted shall be subject to EPA comment in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended. BP Products shall implement the control plan pursuant to its proposed schedule by no later than 60 Days after submission to EPA. If EPA does not submit comments to BP Products within the 60-Day period for implementation, the control plan and schedule remain subject to EPA comment in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended.

**6. Sub-paragraph 19.F (Carbon Canisters)** of the Consent Decree is amended by adding the following new sub-paragraphs 19.F.iv., 19.F.v., and 19.F.vi. at the end thereof:

19.F.iv. In lieu of the option available to BP Products under sub-paragraph 19.F. of the Consent Decree to comply with either sub-paragraph 19.F.i. or 19.F.ii, and in lieu of the compliance deadline set forth in sub-paragraph 19.F.i.a. allowing until "the end of the first full calendar year after the Date of Lodging" of the original Consent Decree to comply with the installation requirements of sub-paragraph 19.F.i., by no later than one year from the Date of Entry of the Sixth Amendment, at all locations within the Texas City Facility where carbon canisters are currently installed and used as the control device for complying with the Benzene Waste Operations NESHAP, BP Products shall implement and comply with the "dual canister" option under sub-paragraph 19.F.i.,

15

except as provided for in sub-paragraph 19.F.v. BP Products may comply with the
requirements of the dual canister option required under this sub-paragraph by using a
single canister with a "dual carbon bed" if the dual carbon bed configuration allows for
breakthrough monitoring between the primary and secondary beds in accordance with
this sub-paragraph. In lieu of the 50 ppm VOC breakthrough threshold specified in sub-
paragraph 19.F.i.c. of the Consent Decree, breakthrough shall be defined as either 50
ppmv VOC or 1 ppmv benzene as monitored between the primary and secondary carbon
beds. Beginning on the Date of Entry of the Sixth Amendment, BP Products shall not use
the "single canister" option under sub-paragraph 19.F.ii. for any new waste management
unit(s) or refinery process unit(s) at the Texas City Facility where carbon canisters shall
be installed and used as the control device for complying with the Benzene Waste
Operations NESHAP, except as provided for in sub-paragraph 19.F.v. In accordance
with sub-paragraph 19.S. (Reports Re: Canisters), BP Products shall submit a project
completion report to EPA detailing the actions performed to comply with this sub-
paragraph.

19.F.v. After the Date of Entry of the Sixth Amendment, for any carbon canister
at the Texas City Facility subject to this sub-paragraph, if BP Products demonstrates that
it is technologically infeasible or unsafe to comply with the dual-canister option under
sub-paragraph 19.F.i., BP Products may use the "single canister" option under sub-
paragraph 19.F.ii. of the Consent Decree. BP Products shall submit a written request to
EPA to comply with the "single canister" option under sub-paragraph 19.F.ii for each
such canister. This request shall specifically identify each carbon canister for which BP
Products claims that it is technologically infeasible or unsafe to comply with the dual-

16

canister option and shall provide a detailed explanation of the specific technical and/or safety reasons for the request. This request shall be subject to EPA approval in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended.

19.F.vi. Nothing in sub-paragraph 19.F. of the Consent Decree, as amended, is intended to preclude BP Products from electing to use other control devices specified at 40 C.F.R. 61.349(a)(2)(i); (a)(2)(ii); or (a)(2)(iii) at the Texas City Facility to comply with the Benzene Waste Operations NESHAP instead of or in addition to carbon adsorption, provided that such other control technology meets all applicable control and/or treatment requirements under the Benzene Waste Operations NESHAP. If BP Products elects to use other control technology, BP Products shall submit written notification to EPA providing both the location where such other control technology shall be used instead of or in addition to carbon adsorption and a description of the other technology to be used.

**7. Sub-paragraph 19.G (Annual Program)** of the Consent Decree is amended by adding the following new sub-paragraphs 19.G.i. - 19.G.iii at the end thereof:

19.G.i. Management of Change. No later than 180 Days from the Date of Entry of the Sixth Amendment, BP Products shall implement any necessary revisions to all applicable policies, procedures, and guidance documents pertaining to management of change at the Texas City Facility. These revisions shall require management of change reviews to consider and adequately address how actions or changes triggering review under such policies, procedures, or guidance documents affect the existence, nature, and control of benzene waste streams at the Texas City Facility. Specifically, these revisions shall require management of change reviews to consider and address:

17

        a.  whether a new waste stream regulated under the Benzene Waste
            Operations NESHAP is created and/or generated;

        b.  whether the characteristics of an existing waste stream, including
            benzene concentration, waste stream flow rate, annual quantity, and
            water content shall change; and

        c.  the actions necessary to properly account for, control, and report on
            any such new or modified waste streams.

19.G.ii.  BP Products shall train all employees and contractors who lead

management of change reviews and/or analyses on the revised policies, procedures, and

guidance documents by no later than 120 Days following the date such revisions are

implemented as required by sub-paragraph 19.G.i.

19.G.iii.  Semi-annual Progress Reports.  BP Products shall submit semi-annual

progress reports to EPA regarding the implementation of the revisions and training

required under sub-paragraphs 19.G.i. and 19.G.ii. in accordance with Section VIII of the

Consent Decree, as amended.

**8. Sub-paragraph 19.N. (Sampling (6 Mg/yr))** of the Consent Decree is amended by

adding the following new sub-paragraphs 19.N.i.a. and 19.N.i.b. at the end of sub-paragraph

19.N.i. and new sub-paragraph 19.N.ii.a. at the end of sub-paragraph 19.N.ii. respectively:

19.N.i.a.  In lieu of the requirements of Paragraph 19.N.i. of the Consent Decree,

by no later than January 1, 2009 or within 30 Days from the Date of Entry of the Sixth

Amendment, whichever occurs later, BP Products shall submit a revised February 12,

2003 EOL Sampling Plan that shall be subject to EPA approval in accordance with sub-

paragraphs 33.F. and 33.G. of the Consent Decree, as amended.  The revised EOL

Sampling Plan shall contain any proposed changes to the existing sampling locations and

any proposed changes in methods for flow calculations to be used in the quarterly

18

benzene determinations. BP Products shall commence sampling under the revised EOL Sampling Plan by no later than the first full Calendar Quarter following submittal of the plan to EPA, regardless of whether the plan is approved at that time. BP Products shall comply with the proposed revised EOL Sampling Plan. However, EPA retains its rights of approval pursuant to sub-paragraphs 33.F. and 33.G.

19.N.i.b. If changes in processes, operations, or other factors lead BP Products to conclude that the EOL Sampling Plan for the Texas City Facility may no longer provide a representative basis for estimating the Texas City Facility's annual or quarterly EOL benzene quantity, then by no later than ninety (90) Days after BP Products makes this determination, BP Products will submit to EPA a newly proposed revised EOL Sampling Plan. Upon receipt of EPA approval, BP Products shall commence sampling consistent with the requirements and schedule contained in the newly approved EOL Sampling Plan

19.N.ii.a. In lieu of the requirement in sub-paragraph 19.N.ii. for refineries operating under the 6 Mg/yr compliance option to sample all uncontrolled waste streams that count toward the 6 Mg/yr calculation and contain greater than 0.05 Mg/yr of benzene on an annual basis, the Texas City Facility shall sample on a quarterly basis each existing individual uncontrolled waste stream that counts toward the 6 Mg/yr calculation and contains greater than 0.05 Mg/yr of benzene. No earlier than two (2) years from the Date of Entry of the Sixth Amendment, BP Products may submit a request to EPA to either terminate or revise the frequency of the sampling required under this sub-paragraph N.ii.a. This request shall be subject to EPA approval in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended. However, if EPA does not respond in writing within 120 Days of the request's submission, the request shall be deemed

19

disapproved and BP Products shall have the right to invoke Dispute Resolution under Section XIV of the Consent Decree.

**9. Sub-paragraph 19.P.iv. (Miscellaneous Measures)** of the Consent Decree is amended by adding the following new sub-paragraphs 19.P.iv.a. and 19.P.iv.b. at the end thereof:

19.P.iv.a. By no later than the first full Calendar Quarter following the Date of Entry of the Sixth Amendment, for all oil-water separator units utilizing floating roofs at the Texas City Facility, BP Products shall conduct at least quarterly measurement of secondary seal gaps in accordance with the requirements and standards of 40 C.F.R. § 60.693-2(a).

19.P.iv.b. If quarterly measurement identifies secondary seal gap-width and/or total gap area measurements exceeding the requirements of 40 C.F.R. § 60.693-2(a)(1)(ii), BP Products shall make all necessary repairs to correct such exceedances within 30 Days in accordance with 40 C.F.R. § 60.693-2(a)(1)(iv) subject to the delay of repair provisions of 40 C.F.R. § 60.692-6.

**10. Sub-paragraph 19.V. (Quarterly Reports)** of the Consent Decree is amended by adding the following new sentences at the end of the first paragraph thereof:

19.V. In lieu of the above quarterly reporting requirement, commencing on the Date of Entry of the Sixth Amendment, the Texas City Facility shall submit semi-annual EOL reports containing the following information to EPA. These semi-annual EOL reports shall be due to EPA by no later than February 15 and August 15 of each calendar year following the Date of Entry.

**11. Sub-paragraph 19.V. (Quarterly Reports)** of the Consent Decree is further amended by adding the following new sub-paragraphs 19.V.ii.a., 19.V.iii.a., 19.V.iv.a., 19.V.viii, and 19.V.ix at the end of subparagraphs 19.V.ii., 19.V.iii., 19.V.iv., and 19.V.vii. respectively:

19.V.ii.a. In lieu of the requirements of sub-paragraph 19.V.ii., the Texas City Facility shall submit a semi-annual EOL report to EPA that includes the following information for each Calendar Quarter during the semi-annual reporting period: 1) a list of all waste streams sampled at the Texas City Facility pursuant to sub-paragraphs 19.N.i and 19.N.ii, as amended by sub-paragraphs 19.N.i.a., 19.N.i.b., and 19.N.ii.a., 2) the results of the quarterly sampling conducted pursuant to sub-paragraphs 19.N.i and 19.N.ii, as amended, including the results of the benzene analysis for each sample, 3) the computation of the EOL benzene quantity for each quarter, 4) any other related information required under a revised EOL Sampling Plan submitted pursuant to sub-paragraphs 19.N.i.a. or 19.N.i.b., and 5) any information regarding the creation or identification of waste management units and/or waste streams required pursuant to sub-paragraph 19.D.v.

19.V.iii.a. In lieu of the requirements of sub-paragraph 19.V.iii., BP Products shall use all sampling results and approved flow calculation methods pursuant to sub-paragraph 19.N.i, as amended by sub-paragraphs 19.N.i.a. and 19.N.i.b., to calculate and report a quarterly (for each Calendar Quarter during the semi-annual reporting period) and a calendar year uncontrolled benzene quantity for the Texas City Facility against both the 6 Mg Option and the 4 Mg Operational Benchmark.

19.V.iv.a. In lieu of the requirements of sub-paragraph 19.V.iv. of the Consent Decree, in accordance with the 4 Mg Operational Benchmark, if the quarterly

21

uncontrolled benzene quantity (for any Calendar Quarter during the semi-annual reporting period) at the Texas City Facility exceeds 1.0 Mg or the annual uncontrolled benzene quantity exceeds 4 Mg, then BP Products shall, as specified below, conduct a Root Cause Failure Analysis and develop a corrective action plan to promptly address the findings of the Root Cause Failure Analysis. The findings of the Root Cause Failure Analysis and corrective action plan shall be submitted to EPA in a written report included along with the first semi-annual EOL report required under sub-paragraph 19.V., as amended, following completion of the Root Cause Failure Analysis. This corrective action plan shall be subject to EPA comment in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended. BP Products shall implement the corrective action plan pursuant to its proposed schedule by no later than 60 Days after submission to EPA. If EPA does not submit comments to BP Products within the 60-Day period for implementation, the corrective action plan and schedule remain subject to EPA comment in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended. The 1.0 Mg quarterly benchmark and the 4 Mg annual benchmark shall not be used for determining compliance with the 6 Mg Option, the associated requirements of the Benzene Waste Operations NESHAP, and the Consent Decree as amended by the Sixth Amendment. The Texas City Facility's compliance shall be determined against an annual uncontrolled benzene quantity of 6 Mg.

(1) Root Cause Failure Analysis. The Root Cause Failure Analysis required under this sub-paragraph shall include the following elements:

A. If the root cause(s) of the quarterly or annual benchmark exceedance is attributable to at least one

22

discrete event, or to at least one discrete series of
related events, resulting in 0.5 Mg or more of
uncontrolled benzene, BP Products shall include an
estimate of the quantity of uncontrolled benzene
emitted into the ambient air along with the calculations
used to determine such emissions;

B. The steps, if any, taken to limit the duration and/or
quantity of uncontrolled benzene exceeding the 1.0 Mg
quarterly benchmark or the 4 Mg annual benchmark;

C. A detailed analysis setting forth the root cause(s) for
exceeding the benchmark; and

D. An analysis of the measures reasonably available to
prevent the root cause(s) for the exceedance from
recurring. This analysis shall include an evaluation of
possible design, operational, and maintenance
measures. This analysis shall also include a discussion
of alternative measures that are reasonably available,
their relative probable effectiveness, and their relative
costs.

(2) Corrective Action Plan. The corrective action plan required under this

sub-paragraph shall require BP Products to undertake as expeditiously as

reasonably possible any such interim and/or long-term corrective actions as are

necessary and consistent with good air pollution control practices to prevent a

recurrence of the root cause(s) identified in the Root Cause Failure Analysis.

The corrective action plan shall include a description of any corrective actions

already completed or, if not complete, a schedule for their implementation

including proposed commencement and completion dates.

19.V.viii.  Certification of Compliance. BP Products shall certify each semi-

annual EOL report required under sub-paragraph 19.V., as amended, in accordance with

the certification statement required under Paragraph 34 of the Consent Decree.

23

19.V.ix. EOL and EBU Enhanced Monitoring Data. In accordance with sub-paragraph 19.X.i.c., BP Products shall submit all daily average monitoring data from each in-line gas chromatograph and flow rate monitor along with the semi-annual EOL reports required under this sub-paragraph 19.V, as amended. In addition, BP Products shall submit all monitoring data and results from the most recent semi-annual Enhanced Biodegradation Unit ("EBU") ambient air monitoring required under sub-paragraph 19.X.ii. along with the applicable semi-annual EOL report required under this sub-paragraph 19.V, as amended.

**12. Benzene Waste Operations NESHAP Enhanced Compliance Measures**: In addition to maintaining compliance with all applicable requirements of the Benzene Waste Operations NESHAP and the Consent Decree, as amended, BP Products shall undertake the following measures to minimize or eliminate fugitive benzene emissions at the Texas City Facility and to ensure its future compliance with the Benzene Waste Operations NESHAP and the Consent Decree, as amended. **Paragraph 19 (Benzene Waste NESHAP)** of the Consent Decree is therefore further amended by adding the following new sub-paragraphs 19.W. – 19.EE. at the end of sub-paragraph 19.V., as amended herein.

19.W. **Cooling Tower Water Monitoring and Repair Program**. BP Products shall develop and implement a Cooling Tower Water Monitoring and Repair Program at the Texas City Facility. The purpose of the Cooling Tower Water Monitoring and Repair Program shall be to promptly detect, identify, and repair heat exchanger Leaks that allow process fluids to enter Cooling Tower Systems so as to minimize emissions of benzene from Cooling Tower Systems.

24

i. Applicability. The requirements of the Cooling Tower Water Monitoring and Repair Program shall apply to all Cooling Tower Systems for the process units at the Texas City Facility identified in Appendix K, attached hereto.

   a. Idled FCCU 2 Unit. If BP Products restarts the idled FCCU 2 process unit at the Texas City Facility, this unit shall be subject to the requirements of the Cooling Tower Water Monitoring and Repair Program.

   b. Changes in Operation. If BP Products changes the feed characteristics, operating characteristics, and/or operating conditions of any process unit not subject to the Cooling Tower Water Monitoring and Repair Program (including, but not limited to, the Acid Plant, Alkylation Unit 3 (both Main and Debut), Cat Feed Hydrotreater Unit, Lab, Shop, and Refinery Warehouse) such that the potential arises for that process unit's Cooling Tower System water to come into contact with process fluids that have an annual mean benzene content of 0.1% (by weight) or greater, that Cooling Tower System shall become subject to the requirements of the Cooling Tower Water Monitoring and Repair Program as provided herein.

ii. Monitoring and Repair Plan. By no later than 60 Days following the Date of Entry of the Sixth Amendment, BP Products shall prepare, implement, and maintain onsite at all times at the Texas City Facility a "Cooling Tower Monitoring and Repair Plan" that includes the following information:

   a. Identification of all Cooling Tower Systems at the Texas City Facility;

25

b. Identification of all Cooling Tower Systems at the Texas City Facility subject to the requirements of the Cooling Tower Water Monitoring and Repair Program;

c. Identification of the heat exchangers in cooling water service and process units serviced by each Cooling Tower System at the Texas City Facility;

d. The range and annual mean of benzene by weight percent in the process fluids in each heat exchanger identified above in sub-paragraph 19.W.ii.c.;

e. The procedures for conducting monthly monitoring, as well as the grab sampling required under sub-paragraph 19.W.iii.c., of each Cooling Tower System subject to the requirements of the Cooling Tower Water Monitoring and Repair Program, including the specific locations where such monthly monitoring and grab sampling will be performed at each Cooling Tower System;

f. The methods used to identify leaking heat exchangers if a Leak is detected;

g. Standard repair procedures that reduce emissions from Leaks;

h. Procedures for reporting Leaks into a Cooling Tower System; and

i. A listing of critical spare parts that must be maintained in inventory.

iii. Monthly Cooling Tower System Monitoring. By no later than the Date of Entry of the Sixth Amendment, BP Products shall commence monthly monitoring of all Cooling Tower Systems at the Texas City Facility subject to

the requirements of the Cooling Tower Water Monitoring and Repair Program as follows:

    a.  At least once per month, BP Products shall monitor the Cooling Tower System Return Line(s) using the El Paso Method described in Appendix P of the Texas Commission on Environmental Quality *Sampling Procedures Manual*. This monthly monitoring shall occur at a point within the Cooling Tower System Return Line(s): 1) before the possibility of air stripping and/or exposure to the atmosphere can occur, and 2) where flow conditions are sufficient to detect potential Leaks;

    b.  If either: 1) the monthly monitoring required under sub-paragraph 19.W.iii.a. indicates a head space VOC concentration greater than 1 ppmv, or 2) any automated continuous field gas chromatograph installed on a Cooling Tower System subject to this sub-paragraph 19.W. detects total HRVOCs at a concentration of 50 parts per billion by weight ("ppbw") or greater, BP Products shall collect and speciate a headspace sample, in accordance with EPA Method T015 ("Determination of Volatile Organic Compounds (VOCs) in Air Collected in Specially-Prepared Canisters and Analyzed by Gas Chromatography/Mass Spectrometry (GC/MS)"), for benzene and all other compounds required under Method T015. These head space sample results shall be converted to benzene concentration by weight

27

in water using the equation set forth in Appendix P of the Texas

Commission on Environmental Quality *Sampling Procedures Manual*.

    1.  Using the benzene concentration by weight in water derived

from the head space sampling conducted in accordance with

sub-paragraph 19.W.iii.b., BP Products shall calculate and

record the potential benzene mass leak rate using the

following equation:

$$L_{BZ} = 0.012 C_{BZ} \ Q_{CT}$$

Where:

$L_{BZ}$ = Mass leak rate of benzene (lbs/Day);

$0.012$ = Constant for unit conversion (lbs/gallon x
minutes/Day x part per million parts);

$C_{BZ}$ = Concentration of benzene in the cooling tower
water prior to exposure to the air (ppmw); and

$Q_{CT}$ = Volumetric flow rate of cooling tower water to
the cooling tower (gallons/minute).

    2.  If "$L_{BZ}$" is equal to or greater than 10 pounds per day of
benzene, then the Cooling Tower System shall be deemed
to have a "Leak".

  c.  In addition to the monthly monitoring required under sub-

paragraphs 19.W.iii.a. and 19.W.iii.b., BP Products shall complete monthly grab

sampling from the Cooling Tower System Return Lines as follows:

    1.  If at any time after the Date of Entry of the Sixth

Amendment the monthly monitoring required under sub-

paragraph 19.W.iii.a. indicates a head space VOC

concentration greater than 1 ppmv, BP Products shall also

28

take at least three (3) representative grab samples from the
Cooling Tower System Return Lines at a point within the
Cooling Tower System Return Line(s): 1) before the
possibility of air stripping and/or exposure to the
atmosphere can occur, and 2) where flow conditions are
sufficient to detect potential Leaks.  No earlier than two (2)
years from the Date of Entry of the Sixth Amendment, BP
Products may submit a request, along with supporting
documentation establishing that the El Paso air stripping
method and EPA Method 8260B ("Volatile Organic
Compounds by Gas Chromatography/Mass Spectrometry
(GC/MS), Revision 2 (or subsequent revisions), dated
December 1996") analysis of water grab samples are
equivalent in their respective abilities to detect Leaks, to
EPA to either terminate or revise the frequency of the
sampling required under this sub-paragraph 19.W.iii.c(1).
This request shall be subject to EPA approval in
accordance with sub-paragraphs 33.F. and 33.G. of the
Consent Decree, as amended.  However, if EPA does not
respond in writing within 120 Days of the request's
submission, the request shall be deemed disapproved and
BP Products shall have the right to invoke Dispute
Resolution under Section XIV of the Consent Decree.

2.    For a period of no less than six (6) months following the Date of Entry of the Sixth Amendment, at least once´per month BP Products shall take at least three (3) representative grab samples from the Cooling Tower System Return Lines at the Cooling Tower System for the Fluid Catalytic Cracker Unit 3 ("FCCU 3") and the Ultracracker Unit ("ULC") at a point within the Cooling Tower System Return Line(s): 1) before the possibility of air stripping and/or exposure to the atmosphere can occur, and 2) where flow conditions are sufficient to detect potential Leaks.  In addition, during each of any two (2) months during the six (6) month period following the Date of Entry of the Sixth Amendment, BP Products shall take at least three (3) representative grab samples from the Cooling Tower System Return Lines at all other Cooling Tower Systems subject to the requirements of sub-paragraph 19.W. at a point within the Cooling Tower System Return Line(s): 1) before the possibility of air stripping and/or exposure to the atmosphere can occur, and 2) where flow conditions are sufficient to detect potential Leaks.

3.    Each grab sample shall be collected in accordance with the sampling procedures at 40 C.F.R. § 61.355(c)(3) of the Benzene Waste Operations NESHAP.  In addition, each

grab sample shall be analyzed in accordance with EPA Method 8260B to determine the benzene concentrations of the sample.

iv. Repair of Leaking Cooling Tower Systems. If the benzene mass leak rate determined in accordance with the requirements of sub-paragraph 19.W.iii.b. indicates a Leak, BP Products shall make a first attempt at identifying and repairing the Leak by no later than 45 Days after conducting the monthly monitoring that first identified the Leak. Attempts at repair may include, but are not limited to: 1) physical repairs to the leaking heat exchanger; 2) blocking the leaking tube within the heat exchanger; 3) changing the pressure so that water flows into the process fluid; and/or 4) replacing the Leaking heat exchanger.

   a. Delay of Repair. If the first attempt at repairing the Leak is not successful, as determined by confirmation monitoring conducted pursuant to sub-paragraph 19.W.iv.c., BP Products may delay completing repairs beyond the initial 45-Day deadline, unless a shorter time period is otherwise required by law, if BP Products establishes both that one of the following conditions exist and that it has taken all necessary and appropriate interim measures pursuant to sub-paragraph 19.W.iv.b. below:

      1. If a process unit shutdown is not required to repair a Leak but the necessary parts to complete repairs are not available, BP Products must complete the repairs as soon as reasonably

31

possible upon receiving the necessary parts, but in no case later than 120 Days after first identifying the Leaking heat exchanger;

2. If a process unit shutdown is necessary to repair a Leak, BP Products must complete repairs to the leaking heat exchanger within 90 Days after conducting the monthly monitoring that first identified a Leak unless the projected cumulative VOC and NOx emissions from the Leak (the "Cumulative LEAK Emissions") over that 90 Day period will not exceed the projected actual post-combustion VOC and NOx emissions resulting from the shutdown and startup of the process unit served by the leaking heat exchanger and any other process units required to be shutdown in order to repair the Leak (the "Startup and Shutdown Emissions"). If the projected Cumulative LEAK Emissions over the initial 90 Day period have not exceeded the Startup and Shutdown Emissions, BP Products shall have additional Days to complete repairs of the Leaking heat exchanger as determined in accordance with the following formula:

**Additional Delay of Repair Days** =

$$\frac{\text{Startup and Shutdown Emissions} - \text{Cumulative LEAK Emissions}}{\text{LEAK Emissions}_{TWA}}$$

Where:

"Startup and Shutdown Emissions" = the sum of post-combustion VOC and NOx emissions in pounds that are projected to result from a shutdown and startup of the process unit served by the leaking heat exchanger and any other process units required to be shutdown in order to repair the Leak;

"Cumulative LEAK Emissions" = the sum of VOC and NOx emissions in pounds that are projected to result from continuing to operate the leaking heat exchanger. Cumulative LEAK Emissions shall be determined as follows:

$\Sigma (LEAK_n \times TIME_n)$

Where:

"LEAK" = the mass leak rate of VOCs and NOx as determined by the monthly monitoring required by sub-paragraph 19.W.iii. and any additional Leak monitoring conducted by BP Products in accordance with sub-paragraph 19.W.iii.; and

"TIME" = the number of Days between each monthly monitoring event required by sub-paragraph 19.W.iii. and any additional Leak monitoring events conducted by BP Products in accordance with sub-paragraph 19.W.iii.

"LEAK Emissions $_{TWA}$" = the sum of VOC and NOx emissions in pounds per Day that are projected to result from continuing to operate the leaking heat exchanger. LEAK emissions shall be determined on a time weighted average ("TWA") as follows:

$$\frac{\Sigma (LEAK_n \times TIME_n)}{\Sigma TIME_n}$$

3. During any delay of repair period, monthly monitoring required pursuant to sub-paragraph 19.W.iii. shall continue and the Cumulative LEAK Emissions from the Cooling Tower System shall be recalculated using each new set of monthly monitoring results, the results of any additional Leak monitoring conducted by BP Products in accordance with sub-paragraph 19.W.iii., and the time period between the

33

most recent monitoring results and the next planned shutdown.

b. <u>Interim Measures</u>. If BP Products asserts that delay of repair conditions exist, BP Products shall take all necessary and appropriate interim measures to minimize the emission of benzene from the leaking Cooling Tower System until repairs can be completed.

c. <u>Confirmation Monitoring</u>. Once BP Products has repaired a Leak pursuant to the requirements of sub-paragraph 19.W.iv., it shall conduct monitoring in accordance with sub-paragraph 19.W.iii.a. and sub-paragraph 19.W.iii.b., if sub-paragraph 19.W.iii.b. is applicable, within 7 Days of completing the repair or within 7 Days of completing the startup, whichever is later, to confirm that the Leak has been successfully repaired. If confirmation monitoring indicates that a Leak still exists, a new 45-Day period for identification and repair of the Leak, in accordance with sub-paragraph 19.W.iv., shall commence on the date the confirmation monitoring indicating a continuing Leak is conducted.

v. <u>TAB Report</u>. Beginning with the calendar year 2009 TAB report submitted for the Texas City Facility, BP Products shall report any Cooling Tower System Leaks as a separate line-item in the TAB report. This line-item shall not be counted towards the uncontrolled benzene quantity under either the 6 Mg Option or 4 Mg Operational Benchmark.

34

vi.  <u>Semi-annual Progress Reports</u>.  BP Products shall submit semi-annual
    progress reports regarding the requirements of sub-paragraph 19.W. to EPA in
    accordance with Section VIII of the Consent Decree, as amended.

vii.  <u>Automated Benzene Monitoring/Sampling</u>.  If improved automated
    monitoring and/or sampling technology (*e.g.*, improved gas chromatograph
    technology) becomes available, or if BP Products chooses to install a separate
    automated monitoring and/or sampling system to detect benzene in Cooling
    Tower System water at the Texas City Facility, BP Products shall have the
    option to install such technology and use such automated systems to comply
    with the monthly monitoring requirements of sub-paragraph 19.W.iii.a.,
    provided that such new technology or system is otherwise capable of meeting
    the requirements of the Cooling Tower Water Monitoring and Repair
    Program.

    a.  If BP elects to install improved automated monitoring and/or sampling
       technology to comply with the monthly monitoring requirements of
       sub-paragraph 19.W.iii.a., BP shall submit written notification to EPA
       of such election, and this notification shall be subject to EPA comment
       in accordance with sub-paragraphs 33.F. and 33.G. of the Consent
       Decree, as amended.

19.X.  **Enhanced EOL and EBU Monitoring**.

i.  <u>Gas Chromatograph and Flow Rate Monitoring</u>.  For purposes of this sub-
    paragraph "continually" shall mean no less frequent than once every two
    hours.

a. By no later than January 1, 2009 or 90 Days after the Date of Entry of the Sixth Amendment, whichever is later, BP Products shall install and operate in-line gas chromatograph ("GC") technology and flow rate monitors so as to continually monitor for benzene concentration and flow rate:

   1. At each EOL sampling point identified in the Texas City Facility's End-of-Line Sampling Plan required pursuant to sub-paragraph 19.N.i.a. of this Sixth Amendment; and

   2. At the combined inlet of the F-8 and F-9 EBU tanks at the Texas City Facility.

b. If at any time after the Date of Entry of the Sixth Amendment, the location of any existing EOL sampling point is changed or if additional EOL sampling points are designated, BP Products shall submit a revised EOL Sampling Plan in accordance with sub-paragraph 19.N.i.b. that contains an action plan and implementation schedule for installing and operating in-line gas chromatograph technology and flow rate monitors at each changed or newly designated EOL sampling point.

c. BP Products shall submit all daily average monitoring data from the previous two (2) Calendar Quarters from the in-line gas chromatographs and flow rate monitors to EPA on a semi-annual basis along with the Texas City Facility's semi-annual EOL reports required under sub-paragraph 19.V.ix.

d. On an annual basis, BP Products shall conduct a quality assurance/quality control ("QA/QC") audit of the in-line gas

36

> chromatograph and flow rate monitoring data to ensure the accuracy of
> the data, as well as the proper calibration of the GC and flow rate
> monitors.
>
> e. The Parties acknowledge that BP Products will determine compliance
>    with the 6 BQ Option based on the methods specified in 40 C.F.R
>    61.355(k).

ii.    DIAL Monitoring of EBUs. By no later than April 1, 2010, BP Products shall
       conduct emissions monitoring of EBU tanks F-8 and F-9 (the "EBUs") located at
       the Texas City Facility. At any time during winter months (*i.e.*, January –
       March), BP Products shall use Differential Absorption Light Detection and
       Ranging methodology ("DIAL") in ultra-violet ("UV") mode and appropriately
       situated wind speed and direction sensors to determine the mass emission rate of
       benzene from the EBUs over the applicable DIAL testing period.

> a. At least 120 Days prior to commencing the DIAL monitoring required
>    under this sub-paragraph 19.X.ii., BP Products shall submit a Quality
>    Assurance Project Plan ("QAPP") that shall be subject to EPA
>    comment in accordance with sub-paragraphs 33.F. and 33.G. of the
>    Consent Decree, as amended. BP Products shall implement the QAPP
>    prior to the first DIAL monitoring event and, if necessary, the
>    subsequent DIAL monitoring event. If EPA does not submit
>    comments to BP Products prior to the first monitoring event, the
>    QAPP remains subject to EPA comment in accordance with sub-
>    paragraphs 33.F. and 33.G. of the Consent Decree, as amended.

37

b.  The QAPP shall specify how the EBUs shall be tested using DIAL methodology, how the mass emission rate of benzene from the EBUs shall be calculated, and how the mass of benzene that is biologically digested in the EBUs will be determined using a mass balance calculation.  The QAPP shall also ensure that the DIAL monitoring events meet the following additional requirements:

   1.  DIAL monitoring of the EBUs shall be conducted for a period of no less than three (3) Days;

   2.  Wastewater samples from the EBUs' inlet and outlet streams shall be collected contemporaneously during each monitoring event and analyzed for benzene concentration.  No fewer than four (4) wastewater samples from the EBUs' inlet streams and no fewer than four (4) wastewater samples from the EBUs' outlet streams shall be collected during each Day of each DIAL monitoring event to accurately determine the benzene mass in the EBUs' influent and effluent; and

   3.  Each DIAL monitoring event shall be conducted while the EBUs are operating under wastewater flow and benzene concentration conditions that are representative of the EBUs' intended normal operating conditions.

c.  If the results of the winter DIAL monitoring required under this sub-paragraph demonstrate that less than 90% of the inlet mass of benzene to the EBUs is being biologically digested (as determined by mass

38

balance calculation), BP Products shall conduct an additional DIAL
monitoring event of the EBUs during summer months (*i.e.*, July –
September) in accordance with the requirements of this sub-paragraph
19.X.ii. within one year from the date of completing the winter DIAL
monitoring;

d. BP Products shall submit the DIAL monitoring results and data to
EPA as part of its semi-annual EOL reporting as required under
Paragraph 19.V.ix.

e. BP Products shall notify EPA in writing at least 30 Days prior to each
of the DIAL monitoring events.

19.Y. **Control of Wastewater Overflows**. BP Products shall take the following
measures to control the emission of benzene from overflows of Aqueous Benzene Wastes
from the Texas City Facility's controlled wastewater treatment system.

i. West Plant: No later than two (2) years following the Date of Entry of the
Sixth Amendment, BP Products shall complete the following measures to
control overflows of Aqueous Benzene Wastes from the western sector of
the Texas City Facility (the "West Plant"). Overflows of Aqueous Benzene
Wastes from the West Plant shall be controlled by covering, hard-piping,
enclosing, sealing, or otherwise controlling, in accordance with the Benzene
Waste Operations NESHAP, from Lift Stations 1, 2, and 3 up through the
inlets of the F-8 and F-9 EBU tanks within the Texas City Facility's
wastewater treatment plant. These control requirements shall specifically
include covering, hard-piping, enclosing, sealing, or otherwise controlling,

in accordance with the Benzene Waste Operations NESHAP, Lift Station

21, including the North Bay.

ii. East and Central Plant: BP Products shall complete the following measures

to control overflows of Aqueous Benzene Wastes from the eastern and

central sectors of the Texas City Facility (the "East Plant" and "Central

Plant"):

a. Overflow Controls Study. No later than twelve (12) months

following the Date of Entry of the Sixth Amendment, BP Products

shall complete a study and engineering analysis of measures for

eliminating or minimizing uncontrolled overflows of Aqueous

Benzene Wastes from the East Plant and Central Plant ("Overflow

Controls Study"). The Overflow Controls Study shall consider and

evaluate at least the following measures:

1. Installing secondary and/or "double-contained" sumps at
   operating units in the East and Central Plants to control
   overflow from existing dry weather sumps and subsequently
   manage and transport such overflows in a closed system to
   the wastewater treatment plant;

2. Fully sealing or enclosing the East and Central Plant
   wastewater treatment system up to storm water tanks 1054
   and 1056 and the wastewater treatment plant; and

3. Installing a centralized lift station for the East Plant. If
   installed, overflows from operating units in the East Plant
   would be sent via a closed system to this new central lift
   station and then routed via closed system to storm water
   tanks 1054 and 1056 and the wastewater treatment plant.

b. Implementation Plan. No later than 90 Days following the

completion of the Overflow Controls Study and based upon its

40

findings, BP Products shall develop and submit to EPA a plan and schedule for completing the selected measure(s) it proposes to implement to control overflows of Aqueous Benzene Wastes from the East Plant and Central Plant ("Implementation Plan"). The Implementation Plan shall include a detailed explanation of the rationale for both the selected measure(s), as well as all other measures considered in the Overflow Controls Study but not selected. The Implementation Plan shall be subject to EPA approval in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended. However, if EPA does not respond in writing within 120 Days of the Implementation Plan's submission, the request shall be deemed disapproved and BP Products shall have the right to invoke Dispute Resolution under Section XIV of the Consent Decree.

iii. Improved Pumping Capacity and Reliability. No later than one (1) year following the Date of Entry of the Sixth Amendment, BP Products shall improve the level detectors, pumping capacity, and pump reliability at the dry weather sumps and lift stations at the Texas City Facility indicated in Appendix P so as to further reduce the potential for uncontrolled overflows of Aqueous Benzene Wastes from the controlled wastewater treatment system.

19.Z. **[Reserved]**

19.AA. **Enhanced Preventative Maintenance**. BP Products shall take the following actions to enhance its inspections, maintenance, and operation of the uncontrolled and controlled wastewater treatment systems, wastewater treatment plant, associated equipment, and instrumentation at the Texas City Facility:

- i. **Benzene Preventative Maintenance and Operation Plan**. No later than 180 Days following the Date of Entry of the Sixth Amendment, BP Products shall develop and submit a plan to EPA for the enhanced inspection, maintenance, and operation of the uncontrolled and controlled wastewater treatment systems, wastewater treatment plant, associated equipment, and instrumentation at the Texas City Facility ("Benzene PMOP Plan").

  - a. Purpose. The purpose of the Benzene PMOP Plan shall be to prevent and/or minimize emissions of benzene through use of good air pollution control practices in the inspection, maintenance, and operation of the uncontrolled and controlled wastewater treatment systems, wastewater treatment plant, associated equipment, and instrumentation at the Texas City Facility.

  - b. EPA Comment. The Benzene PMOP Plan shall be subject to EPA comment in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended. BP Products shall implement the Benzene PMOP Plan by no later than 60 Days after submission to EPA. If EPA does not submit comments to BP Products within the 60-Day period for implementation, the Benzene PMOP Plan remains

42

subject to EPA comment in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended.

c. Compliance. Upon implementation of the Benzene PMOP Plan, BP Products shall comply with its requirements at all times, including periods of startup, shutdown, and malfunction of individual process or waste management units.

d. Revisions. The Benzene PMOP Plan shall be revised and updated to incorporate additional preventative maintenance measures and/or practices whenever a Root Cause Failure Analysis required under sub-paragraph 19.V.iv.a. determines that such corrective actions would reduce the likelihood of a recurrence of similar uncontrolled emissions. Such revisions to the Benzene PMOP Plan shall be completed within 45 Days of completing the Root Cause Failure Analysis, and BP Products shall thereafter implement the revised PMOP measures and practices.

e. Specific Practices. The Benzene PMOP Plan shall include, but shall not be limited to, procedures for the specific preventative maintenance and operation practices included below in sub-paragraph 19.AA.ii.

ii. **Preventative Maintenance and Operation Practices**. As part of the Benzene PMOP Plan, BP Products shall take the following preventative maintenance and operation practices:

43

a.  **Gravity Sewer Integrity Testing and Repair**.  No later than three

(3) years following the Date of Entry of the Sixth Amendment, BP

Products shall complete integrity testing of the below-grade

combined wastewater treatment system ("Gravity Sewer") at the

Texas City Facility.  Integrity testing shall be completed on all

segments of the controlled portions of the Gravity Sewer that present

a risk of loss of wastewater containment ("exfiltration") and all

segments of the uncontrolled portions of the Gravity Sewer that

present a risk of benzene infiltration.  For the purposes of sub-

paragraph 19.AA.ii., segments of the Gravity Sewer that do not

present a risk of loss of containment or benzene infiltration include

those portions of the Gravity Sewer beneath parking areas, office

building areas, third party operated facilities, idled facilities,

abandoned facilities, and other facilities that do not handle, manage,

and/or process significant quantities of hydrocarbons; provided that,

if an idled or abandoned facility is restarted or otherwise commences

operations, BP Products shall complete integrity testing of all

segments of the Gravity Sewer beneath the formerly idled or

abandoned facility in accordance with this sub-paragraph 19.AA.ii.a.

1.  Schedule.  BP Products shall complete integrity testing of

75% of the total mileage (or feet) of the segments of the

Gravity Sewer subject to the requirements of this sub-

paragraph by no later than two (2) years following the Date

of Entry of the Sixth Amendment. BP Products shall
complete integrity testing of the remaining 25% of the total
mileage (or feet) of the segments of the Gravity Sewer
subject to the requirements of this sub-paragraph no later
than three (3) years following the Date of Entry of the Sixth
Amendment. Integrity testing commenced by BP Products
on or about January 1, 2007 may fulfill the integrity testing
requirements of this sub-paragraph 19.AA.ii.a. provided that
such integrity testing otherwise meets all requirements of the
sub-paragraph.

2. Inspection Methods. BP Products shall use internal probe
camera technology to the maximum extent practicable to
perform integrity inspection and testing of the Gravity Sewer.
If internal camera technology is not practicable or effective,
BP Products may use dye studies and/or other appropriate
inspection and testing methods (taking into consideration
such characteristics as sewer design, construction, and size)
to perform the integrity testing requirements of this sub-
paragraph, provided that such alternative methods are proven
to be at least as effective as internal camera technology.

3. Repairs. If the results of the integrity inspection and testing
indicate that the integrity of the Gravity Sewer has been or
may be compromised to the point at which there is either a

45

risk(s) of significant loss of containment of wastewater

handled by the controlled portions of the Gravity Sewer or a

significant risk(s) of benzene infiltration into the uncontrolled

portions of the Gravity Sewer, BP Products shall develop and

implement a repair plan prioritized according to such risk(s).

    A. BP Products shall utilize one or more of the following
techniques to conduct and complete repairs:

        i. Replacement of the existing defective sewer line;

        ii. Trenchless technology, such as Instituform® or
other appropriate trenchless technology; and/or

        iii. Repair of the existing defective sewer line
segment.

    B. BP Products shall complete such repairs in a timely
fashion in accordance with good engineering judgment
taking into consideration such factors as the risk(s) of
losing containment of wastewater handled by the
controlled portions of the Gravity Sewer, the risk(s) of
benzene infiltration into the uncontrolled portions of the
Gravity Sewer, the quantity of benzene that could be
emitted if containment is lost, the quantity of benzene
that may infiltrate the uncontrolled portions of the
Gravity Sewer, operating unit turnaround schedules,
and proximity of the defective sewer to operating
equipment.

4. Ongoing testing. Following completion of the integrity

testing required under this sub-paragraph, BP Products shall

perform ongoing periodic integrity testing of the Gravity

Sewer in accordance with the Benzene PMOP Plan.

5. Semi-annual Progress Reports. BP Products shall submit

semi-annual progress reports regarding the requirements of

46

sub-paragraph 19.AA. to EPA in accordance with Section

VIII of the Consent Decree, as amended.

b.  **Controlled Sewer Access Points**.  Beginning on the Date of Entry

of the Sixth Amendment and continuing thereafter, BP Products

shall ensure that all hatches, manhole covers, and other access points

to the controlled wastewater treatment system at the Texas City

Facility, other than tanks regulated pursuant to 40 C.F.R. § 61.351,

are sealed and shall remain closed and controlled in accordance with

the Benzene Waste Operations NESHAP.

1.  BP Products shall perform visual inspections of all hatches,

manhole covers, and other access points to the controlled

wastewater treatment system on at least a monthly basis,

unless a shorter period is otherwise required, to ensure that

they remain properly closed and controlled in accordance

with the Benzene Waste Operations NESHAP;

2.  BP Products shall complete any necessary repairs to any

hatches, manhole covers, and/or other access points to the

controlled wastewater treatment system within seven (7)

Days following an inspection indicating that repairs are

needed, unless a shorter timeframe is otherwise required or

unless authorized pursuant to the delay of repair provision of

40 C.F.R. § 61.350;

3. BP Products shall maintain the results of such inspections and repairs in a written log at the Texas City Facility.

19.BB. **Raising Benzene Product Lines**. No later than three (3) years after the Date of Entry of the Sixth Amendment, BP Products shall raise the Benzene Product Pipelines identified in Appendix L above grade.

i. Semi-annual Progress Reports. BP Products shall submit semi-annual progress reports regarding the requirements of sub-paragraph 19.BB. to EPA in accordance with Section VIII of the Consent Decree, as amended.

19.CC. **Benzene Waste Operations NESHAP Controls Compliance Audit**. BP Products shall retain an independent third-party contractor to perform a phased audit of all waste streams and waste management units subject to the Benzene Waste Operations NESHAP at the Texas City Facility to ensure that they are controlled in accordance with the requirements of the Benzene Waste Operations NESHAP ("Benzene Waste Operations NESHAP Controls Compliance Audit").

i. Audit Elements. The Benzene Waste Operations NESHAP Controls Compliance Audit shall include, but not be limited to, the following elements:

a. A review and verification that existing controls on all waste streams and waste management units subject to the Benzene Waste Operations NESHAP at the Texas City Facility are properly installed and maintained in accordance with the Benzene Waste Operations NESHAP; and

48

b. A review of the Annual Program and management of change process for monitoring, identifying, and controlling new and/or modified waste streams subject to the Benzene Waste Operations NESHAP.

ii. Schedule. The Benzene Waste Operations NESHAP Controls Compliance Audit shall be conducted in three separate individual phases for the East Plant, Central Plant, and West Plant during the life of Paragraph 19 of the Consent Decree, as amended. No later than every two (2) calendar years from the Date of Entry of the Sixth Amendment, BP Products shall complete one phase of the Benzene Waste Operations NESHAP Controls Compliance Audit such that, during the life of Paragraph 19 of the Consent Decree, as amended, all waste streams and waste management units shall be reviewed during at least one phase of the Benzene Waste Operations NESHAP Controls Compliance Audit.

iii. Corrective Actions. If the Benzene Waste Operations NESHAP Controls Compliance Audit reveals deficiencies in the controls on any waste stream(s) and/or waste management unit(s) subject to the Benzene Waste Operations NESHAP at the Texas City Facility, BP Products shall submit a corrective action plan and implementation schedule, subject to EPA comment in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended, within sixty (60) Days of the completion of each phase. BP Products shall implement

the corrective action plan pursuant to its proposed implementation schedule by no later than 60 Days after submission to EPA. If EPA does not submit comments to BP Products within the 60-Day period for implementation, the corrective action plan and schedule remain subject to EPA comment in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended.

19.DD. **Tank Geodomes**. No later than two (2) calendar years following the Date of Entry of the Sixth Amendment, BP Products shall either install "geodome" tank covers on or permanently shutdown the tanks located at the Texas City Facility listed in Appendix M.

- i. The geodome tank covers shall be designed and installed so as to reduce the potential annual aggregate benzene emissions from the tanks listed in Appendix M by no less than approximately 3.09 tons, as estimated by EPA's TANKS 4.09D methodology;

- ii. In lieu of installing geodome tank covers, BP Products may install alternative technology on the tanks listed in Appendix M provided that BP Products demonstrates that the alternative technology will provide at least equivalent reductions in benzene emissions to installation of geodome tank covers. BP Products shall submit written notification to EPA if it elects this option. This notice shall be subject to EPA approval in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended.

    iii.  <u>Semi-annual Progress Reports</u>.  BP Products shall submit semi-annual progress reports regarding the requirements of sub-paragraph 19.DD. to EPA in accordance with Section VIII of the Consent Decree, as amended.

    iv.  BP Products shall not generate or use any benzene reductions that result from the projects required under this sub-paragraph 19.DD. as VOC netting reductions or emissions offset credits in any PSD, major non-attainment, and/or minor New Source Review ("NSR") permit or permit proceeding.

    v.  <u>Certification</u>.  By signing this Sixth Amendment, BP Products certifies that it is not required to undertake the actions required by sub-paragraph 19.DD. under any federal, state, or local law or regulation, or as injunctive relief awarded in any other action in any forum, including TCEQ Agreed Order Docket Nos. 2001-0329-AIR-E and 2001-1088-AIR-E.

19.EE.  **Summary of Submission Requirements for the Benzene Waste Operations NESHAP Compliance and Enhanced Compliance Measures**.

In addition to the reporting requirements of 40 C.F.R. § 61.357, at the times specified herein, BP Products shall submit the following to EPA:

    a.  Annual TAB Report pursuant to sub-paragraph 19.A.iii.;

    b.  Benzene Waste Stream Review and Verification Report pursuant to sub-paragraph 19.D.ii.;

    c.  Review and Verification Corrective Action Plan, if necessary, pursuant to sub-paragraph 19.D.iii

    d.  Amended TAB Report, if necessary, pursuant to sub-paragraph 19.D.iv.;

e.  Future Waste Management Unit and/or Waste Stream notification, control plan, and implementation schedule, if necessary, pursuant to sub-paragraph 19.D.v.;

f.  Carbon Canister Project Completion Report pursuant to sub-paragraphs 19.F.iv. and 19.S.;

g.  Request to use the "single canister" option pursuant to sub-paragraph19.F.v.;

h.  Notice of intent to use control technology other than carbon canisters pursuant to sub-paragraph 19.F.vi;

i.  Semi-annual Management of Change Progress Reports pursuant to sub-paragraph 19.G.iii.;

j.  Revised EOL Sampling Plan pursuant to sub-paragraph 19.N.i.a. and, if necessary, sub-paragraph 19.N.i.b.;

k.  Request to Terminate or Revise Frequency of Sampling pursuant to sub-paragraph 19.N.ii.a.;

l.  Semi-annual EOL Reports pursuant to sub-paragraph 19.V., as amended;

m.  Root Cause Failure Analyses and Corrective Action Plans, if necessary, pursuant to sub-paragraphs 19.V.iv.a;

n.  Certification of Compliance pursuant to sub-paragraph 19.V.viii.;

o.  Request to Terminate or Revise Frequency of Sampling pursuant to sub-paragraph 19.W.iii.c(1);

p.  Cooling Tower System Leak TAB line item pursuant to sub-paragraph 19.W.v.;

q. Semi-annual Cooling Tower System Progress Reports pursuant to sub-paragraph 19.W.vi.;

r. Notice of Intent to Install Improved Cooling Tower Automated Monitoring and/or Sampling Technology, if applicable, pursuant to sub-paragraph 19.W.vii.a.;

s.  Semi-annual EOL and EBU GC Monitoring Data pursuant to sub-paragraph 19.X.i.c.;

t. Quality Assurance Project Plan ("QAPP") pursuant to sub-paragraph 19.X.ii.a;

u. DIAL EBU Monitoring Data pursuant to sub-paragraph 19.X.ii.d.;

v. Notice of DIAL EBU Monitoring Test pursuant to sub-paragraph 19.X.ii.e.;

w. East and Central Plant Overflow Controls Implementation Plan pursuant to sub-paragraph 19.Y.ii.b.;

x. Benzene PMOP Plan pursuant to sub-paragraph 19.AA.i.;

y. Gravity Sewer Integrity Testing and Repair Semi-annual Progress Reports pursuant to sub-paragraph 19.AA.ii.a.5;

z. Benzene Product Line Raising Semi-annual Progress Reports pursuant to sub-paragraph 19.BB.i.;

aa. Benzene Controls Compliance Audit Corrective Action Plan, if necessary, pursuant to sub-paragraph 19.CC.iii.;

bb. Request to use control technology other than geodome tank covers, if necessary, pursuant to sub-paragraph 19.DD.ii.;

cc. Tank Geodome Semi-annual Progress Report pursuant to sub-paragraph
19.DD.iii.; and

dd. Semi-annual Progress Reports pursuant to Section VIII of the Consent Decree,
as amended.

All submittals listed above shall include the certification language set forth in Paragraph 34 of
the Consent Decree.

**13.** The Consent Decree is amended by adding the following new **Paragraph 24-A**
**(CFC Compliance Measures)** at the end of **Paragraph 24 (EPCRA Audits)**:

### 24-A. CFC Compliance Measures:

**24-A(A). Definitions**. In addition to the definitions listed in Section IV of the Consent
Decree and Section III of this Sixth Amendment, the following shall apply to the
provisions of this Paragraph:

i. "Comfort Cooling Appliance" or "CCA" shall mean any cooling appliance
covered by 40 C.F.R. § 82.156(i)(5) that: 1) contains fifty (50) or more pounds
of refrigerant, and 2) is not directly linked to any industrial, manufacturing,
and/or commercial process at the Texas City Facility. This definition includes
all cooling appliances listed in Appendix N (or the updated Appendix N
required under sub-paragraph 24-A(B)vii) under a Duty Type of "Other
Refrigeration".

ii. "HRU Chiller" shall mean the IPR (as defined below) with York Compressor
Model No. 805-H located at the Hydrogen Recovery Unit of the Resid
Hydrotreater Unit at the Texas City Facility;

iii. "Industrial Process Refrigeration Appliance" or "IPR" shall mean a cooling appliance regulated under the Recycling and Emissions Reduction Regulations and that is directly linked to an industrial and/or manufacturing process;

iv. "ODS-Leak" or "ODS-Leaks" shall mean, for purposes of Paragraph 24-A of the Sixth Amendment, the loss of containment of an Ozone Depleting Substance that exceeds the relevant leak rate threshold specified in 40 C.F.R. 82.156(i)(2) for IPRs or 40 C.F.R. 82.156(i)(5) for CCAs during a 12-month period.

v. "Monitoring" shall mean efforts undertaken to detect ODS-Leaks using one or more of the test methods listed within Section E of EPA's October 1995 *Compliance Guidance for Industrial Process Refrigeration Leak Repair Regulations Under Section 608 of the Clean Air Act.* Sight glass testing shall not be used as the exclusive method for performing Monitoring.

vi. "Non-Ozone Depleting Substance" or "Non-ODS" shall mean a refrigerant that is: 1) not an ODS (as defined below), 2) has an ozone depleting potential of zero (0), and 3) is approved by EPA, under 40 C.F.R. Part 82, Subpart G, for the end use of an IPR or CCA;

vii. "Non-ODS System" shall mean any cooling system (*e.g.*, IPR or CCA) that either: 1) contains only a Non-ODS refrigerant, or 2) contains no refrigerant;

viii. "Ozone Depleting Substance" or "ODS" shall mean a refrigerant that is regulated under Subchapter VI of the Clean Air Act, 42 U.S.C. §§ 7671-7671q or the implementing regulations at 40 C.F.R. Part 82 as a Class I or Class II substance, or a blend of such Class I or Class II substances;

ix. "Ozone Depleting System" or "ODS System" shall mean any cooling system (*e.g.*, IPR or CCA) other than a Non-ODS System as defined herein;

x. "Recycling and Emissions Reduction Regulations" shall mean the Recycling and Emissions Reduction Regulations for Refrigerants promulgated at 40 C.F.R. Part 82, subpart F, pursuant to Subchapter VI of the Clean Air Act, 42 U.S.C. §§ 7671 – 7671q;

xi. "Replace" or "Replacement" shall mean to remove an existing ODS System and to replace it with a Non-ODS System;

xii. "Retire" or "Retirement" shall mean the permanent removal of an existing cooling appliance from service, together with the proper removal of all refrigerant from the appliance;

xiii. "Retrofit" shall mean a designed change (*e.g.*, conversion) of a cooling appliance from an ODS System to a Non-ODS System;

## 24-A(B) Compliance Measures.

### i. Retrofits/Replacements.

a. HRU Chiller. By no later than July 1, 2011, BP Products shall Retire, Retrofit, and/or Replace the HRU Chiller with a Non-ODS System. BP Products represents that the HRU Chiller is the only IPR located at the Texas City Facility. If BP Products Retires the HRU Chiller, any new IPR installed at the Texas City Facility shall be a Non-ODS System.

b. Comfort Cooling Appliances. By no later than three (3) months following the Date of Entry of the Sixth Amendment, BP Products shall submit a plan and schedule to EPA to Retire, Retrofit, or Replace each CCA listed in

Appendix N (and any additional CCAs listed in the updated Appendix N required under sub-paragraph 24-A(B)vii) with a Non-ODS System. By no later than three (3) years following the Date of Entry of the Sixth Amendment, BP Products must complete all Retirements, Retrofits, and Replacements required under the plan. BP Products shall complete Retirement, Retrofitting, and/or Replacement of at least one-third of the CCAs listed in Appendix N by no later than one calendar year following the Date of Entry of the Sixth Amendment. This plan shall be subject to EPA comment in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended. BP Products shall implement the plan pursuant to its proposed schedule by no later than 60 Days after submission to EPA. If EPA does not submit comments to BP Products within the 60-Day period for implementation, the plan and schedule remain subject to EPA comment in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended.

1. Priority Locations. BP Products shall complete the Retirement, Retrofit, or Replacement of all CCAs listed in Appendix N in at least the following locations within the Texas City Facility by no later than one (1) calendar year following the Date of Entry of the Sixth Amendment:

   A. Cat Feed Hydrotreating Unit ("CFHU");

   B. Cokers;

   C. Resid Hydrotreating Unit 120 East SG; and

57

D. Refinery Warehouse.

c. Following the Date of Entry of the Sixth Amendment, BP Products shall not convert any Non-ODS System at the Texas City Facility to an ODS-System. No CCA listed in Appendix N (or the updated Appendix N required under sub-paragraph 24-A(B)vii) may be removed from one location within the Texas City Facility and reinstalled in another location without first being Retrofitted prior to its re-installation. In addition, BP Products shall not use an ODS System to replace the functions of a CCA Retired pursuant to the requirements of this Paragraph.

d. Chronic Leakers.

1. HRU Chiller. Until the HRU Chiller is either Retired, Replaced, and/or Retrofitted with a Non-ODS System in accordance with this Paragraph, the HRU Chiller shall be subject to the following requirements. Following the Date of Entry of the Sixth Amendment, or the date on which the HRU Chiller becomes operational, whichever is later, BP Products shall perform at least quarterly Monitoring of the HRU Chiller. BP Products shall also conduct leak rate calculations of the HRU Chiller anytime refrigerant is added to the HRU Chiller or the HRU Chiller is evacuated to repair an ODS-Leak.

A. Within thirty (30) Days after BP Products determines or has information demonstrating that the HRU Chiller: 1) is leaking such that the loss of refrigerant exceeds or shall exceed the leak rate threshold provided in 40 C.F.R. § 82.156(i)(2) during any

58

12-month period, and 2) such leak rate has occurred for two consecutive thirty (30) Day periods, the HRU Chiller shall be shutdown until compliance can be assured or the HRU Chiller is Retrofitted or Replaced.

B. In addition, if after the Date of Entry of the Sixth Amendment the HRU Chiller experiences three (3) or more ODS-Leaks within any rolling 12-month period, regardless of whether the ODS-Leaks occur in consecutive months or not, the HRU Chiller shall be shut down and shall not be restarted until the HRU Chiller is Retired, Retrofitted, and/or Replaced in accordance with this Paragraph.

2. Comfort Cooling Appliances. Until the CCAs listed in Appendix N (and any additional CCAs listed in the updated Appendix N required under sub-paragraph 24-A(B)vii) are either Retired, Replaced, or Retrofitted with Non-ODS Systems in accordance with this Paragraph, the CCAs shall be subject to the following requirements. Following the Date of Entry of the Sixth Amendment, BP Products shall perform at least semi-annual Monitoring on each CCA that has not yet been Retired, Replaced, and/or Retrofitted. BP Products shall also conduct leak rate calculations for each CCA listed in Appendix N (and any additional CCAs listed in the updated Appendix N required under sub-paragraph 24-A(B)vii) that has not yet been Retired, Replaced, and/or

Retrofitted anytime refrigerant is added to the CCA or the CCA is evacuated to repair an ODS-Leak.

    A. Following the Date of Entry of the Sixth Amendment, if any CCA at the Texas City Facility experiences three (3) or more ODS-Leaks within any rolling 12-month period, regardless of whether the ODS-Leaks occur in consecutive months or not, BP Products shall Retire, Retrofit, or Replace the CCA within six (6) months from the date BP Products determines or has information demonstrating the third ODS-Leak unless necessary parts or Replacement CCAs are unavailable.

    B. If necessary parts or Replacement CCAs are unavailable, BP Products shall Retire, Retrofit, and/or Replace the CCA within twelve (12) months from the date BP Products determines or has information demonstrating the third ODS-Leak. Within 90 Days of determining that necessary parts or Replacement CCAs are unavailable, BP Products shall submit documentation to EPA demonstrating that the necessary parts or Replacement CCAs are unavailable.

e. All refrigerant removed or evacuated from the HRU Chiller and CCAs while they are Retired, Retrofitted, or Replaced shall either be: 1) sent for destruction (as defined in 40 C.F.R. § 82.104(h); 2) reclaimed (as defined in 40 C.F.R. § 82.152) by a certified reclaimer (as defined in 40 C.F.R.

§ 82.164); or 3) recycled or recovered using equipment certified in accordance with 40 C.F.R. § 82.158.

ii. **New Permanent Cooling Appliances**. Beginning on the Date of Entry of the Sixth Amendment and continuing thereafter, any new permanently installed IPR and/or CCA installed at the Texas City Facility shall be a Non-ODS System.

iii. **Comprehensive ODS-Leak Checks and Repairs**.

a. HRU Chiller. Prior to restarting the HRU, BP Products shall retain a third-party certified technician to perform a complete and thorough leak check of all HRU Chiller components that have the potential to leak refrigerant. These components include, but are not limited to, the HRU Chiller's piping, valves, compressors, and nozzles. The technician must be properly certified in accordance with a technician certification program that has been approved pursuant to the provisions of 40 C.F.R. § 82.161.

1. Any ODS-Leaks found shall be repaired in accordance with sound professional judgment to prevent their recurrence before the HRU Chiller is restarted;

2. Initial and follow-up verification testing shall be performed in accordance with the requirements of 40 C.F.R. § 82.156 using one or more test methods listed within Section E of EPA's October 1995 *Compliance Guidance for Industrial Process Refrigeration Leak Repair Regulations Under Section 608 of the Clean Air Act.* Sight glass testing shall not be used as the exclusive method for performing either initial or follow-up verification testing; and

61

3.  The first CFC Annual Report shall include a listing of any ODS-Leaks found by the technician, a description of any actions taken to repair the ODS-Leaks, a description of the initial and verification testing methods used to verify repairs made, and the results of such verification testing.

b.  Comfort Cooling Appliances.  Within 90 Days of the Date of Entry of the Sixth Amendment, BP Products shall retain a third-party technician(s) that is certified in accordance with a technician certification program that has been approved pursuant to the provisions of 40 C.F.R. § 82.161. This technician shall perform a complete leak check of each CCA listed in Appendix N (and any additional CCAs listed in the updated Appendix N required under sub-paragraph 24-A(B)vii).

1.  Leak checks shall be completed no later than 180 Days following the Date of Entry of the Sixth Amendment;

2.  Any ODS-Leaks founds by the technician shall be repaired in accordance with sound professional judgment to prevent their recurrence;

3.  Both initial and follow-up verification testing shall be performed in accordance with the requirements of 40 C.F.R. § 82.156 on all CCAs evaluated by the technician using one or more test methods listed within Section E of EPA's October 1995 *Compliance Guidance for Industrial Process Refrigeration Leak Repair Regulations Under Section 608 of the Clean Air Act*.

4. The first CFC Annual Report shall include a listing of any ODS-Leaks found by the technician, a description of any actions taken to repair the ODS-Leaks, a description of the initial and follow-up verification testing methods used to verify repairs made, and the results of such verification testing.

c. The requirements of this sub-paragraph 24-A(B)iii to perform ODS-Leak checks and repairs on the HRU Chiller and all CCAs listed in Appendix N (and any additional CCAs listed in the updated Appendix N required under sub-paragraph 24-A(B)vii) may be fulfilled by the ongoing work being performed at the Texas City Facility that was initiated on or about August 2007 by BP Products' third-party contractors Carrier Commercial Services and Coopwood's Air Conditioning Inc., provided that those activities will otherwise fulfill the requirements of this sub-paragraph.

iv. **CFC Preventative Maintenance Protocol**.

a. No later than 60 Days following the Date of Entry of the Sixth Amendment, BP Products shall submit a CFC Preventative Maintenance Protocol to EPA. The CFC Preventative Maintenance Protocol shall establish written procedures to ensure that all cooling appliances (IPRs, CCAs, and others) at the Texas City Facility comply with the Recycling and Emissions Reduction Regulations. The CFC Preventative Maintenance Protocol shall furthermore include specific written procedures to Monitor for, prevent, and minimize ODS-Leaks from all cooling appliances located at the Texas City Facility. The CFC

Preventative Maintenance Protocol shall require that at least the following actions shall be performed at the Texas City Facility:

1. Quarterly Monitoring for the HRU Chiller and semi-annual Monitoring for each CCA listed in Appendix N (and any additional CCAs listed in the updated Appendix N required under sub-paragraph 24-A(B)vii) until such cooling appliances are Retired, Replaced, and/or Retrofitted in accordance with the requirements of this Paragraph;

2. Calculation of leak rates for each cooling appliance at the Texas City Facility any time refrigerant is added or the cooling appliance is evacuated to repair an ODS-Leak; and

3. Initial and follow-up verification testing shall be performed for the HRU Chiller and each CCA in accordance with the requirements of 40 C.F.R. § 82.156 using one or more test methods listed within Section E of EPA's October 1995 *Compliance Guidance for Industrial Process Refrigeration Leak Repair Regulations Under Section 608 of the Clean Air Act.* Sight glass testing shall not be used as the exclusive method for performing either initial or follow-up verification testing.

b. The CFC Preventative Maintenance Protocol shall be subject to EPA comment in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended.  BP Products shall implement the CFC Preventative Maintenance Protocol by no later than 60 Days after

submission to EPA. If EPA does not submit comments to BP Products within the 60-Day period for implementation, the CFC Preventative Maintenance Protocol remains subject to EPA comment in accordance with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended.

c. Upon implementation of the CFC Preventative Maintenance Protocol, BP Products shall comply with its requirements at all times.

v. **CFC Compliance Manager**. By no later than the Date of Entry of the Sixth Amendment, BP Products shall designate at least one full-time employee to be the CFC Compliance Manager for the Texas City Facility. The CFC Compliance Manager shall assume overall accountability (*i.e.*, shall act as the "single point of accountability" or "SPA") for managing and overseeing the Texas City Facility's compliance with the Recycling and Emissions Reduction Regulations and the Stratospheric Ozone Protection provisions of the Clean Air Act, 42 U.S.C. §§ 7671 – 7671q. The CFC Compliance Manager's responsibilities shall include, but shall not be limited to, the following specific duties, responsibilities, and authorities:

a. The CFC Compliance Manager shall successfully complete and undergo regular training in the specific requirements of the Recycling and Emissions Reduction Regulations, and must be familiar with such requirements;

b. The CFC Compliance Manager shall understand and be familiar with the requirements of the CFC Compliance Measures required under this Sixth Amendment;

65

c.  The CFC Compliance Manager shall manage and coordinate all internal activities relating to any actions required at the Texas City Facility for compliance with the Recycling and Emissions Reduction Regulations and this Sixth Amendment;

d.  The CFC Compliance Manager shall maintain all records required under the Recycling and Emissions Reduction Regulations and this Sixth Amendment. The CFC Compliance Manager shall also ensure that all information maintained in the CFC Compliance Database is current and up-to-date;

e.  The CFC Compliance Manager shall ensure that required reports and/or notifications are received in a timely manner by EPA and any other applicable air pollution control agencies;

f.  The CFC Compliance Manager shall verify that any inspections, monitoring, repairs, and/or Retrofit, Replacement, or Retirement work required at the Texas City Facility under the Recycling and Emissions Reduction Regulations and/or this Sixth Amendment are performed by technicians and/or contractors that are properly certified and licensed in accordance with a technician certification program that has been approved pursuant to the provisions of 40 C.F.R. § 82.161 and any other applicable certification or licensing requirements;

g.  The CFC Compliance Manager shall verify that any inspections, monitoring, repairs, and/or Retrofit, Replacement, or Retirement work required under this Sixth Amendment and/or the CFC Preventative

66

Maintenance Protocol are performed in a timely manner and in accordance with the Recycling and Emissions Reduction Regulations and this Sixth Amendment;

h. The CFC Compliance Manager shall be given full authority to carry out his/her responsibilities, including the authority to stop any inspections, monitoring, repairs, and/or Retrofit, Replacement, or Retirement work required at the Texas City Facility under the Recycling and Emissions Reduction Regulations and/or this Sixth Amendment; and

i. The CFC Compliance Manager shall be generally available at the Texas City Facility at all times during normal business hours (excluding holidays and reasonable vacation) and additionally, as needed. If the CFC Compliance Manager shall not be able to perform his/her duties for an extended period of time, BP Products shall provide an alternate CFC Compliance Manager as soon as possible that is capable of performing all duties, responsibilities, and authorities required under this Paragraph until the original CFC Compliance Manager is able to resume his/her position.

vi. **CFC Compliance Database**. By no later than the Date of Entry of the Sixth Amendment, BP Products shall begin operating a Refrigerant Compliance Management software system ("RCM System") that shall be used to maintain all information at the Texas City Facility required by the Recycling and Emissions Reduction Regulations and this Sixth Amendment. The RCM System may be comprised of more than one database(s) and/or application(s).

67

Upon request by EPA or the United States, BP Products shall identify each

database and/or application comprising the RCM System.

    a.  BP Products shall include at least the following information within the

        RCM System:

           1.  All information regarding maintenance and/or inspections of each cooling appliance at the Texas City Facility, including, but not limited to:

              A.  The dates such maintenance and/or inspections are scheduled for;

              B.  The dates such maintenance and/or inspections are actually performed;

              C.  The nature of the inspection and/or maintenance work performed; and

              D.  Any ODS-Leaks found or other findings made during the inspection and/or maintenance work;

           2.  All information regarding any repairs made to each cooling appliance at the Texas City Facility including, but not limited to:

              A.  The date any repair work was performed; and

              B.  The nature of the repair work performed;

           3.  All information regarding initial and follow-up verification testing performed on any cooling appliance at the Texas City Facility including, but not limited to:

              A.  The type of verification test method used;

              B.  The dates such verification testing was performed; and

              C.  The results of such verification testing;

           4.  Calculated leak rates for each refrigerant circuit within each cooling appliance at the Texas City Facility;

5.  Whether any cooling appliance is required to be Retrofitted,
    Replaced, and/or Retired including, but not limited to;

    A.  Whether a cooling appliance shall be Retrofitted, Replaced,
        or Retired;

    B.  The deadline by which such Retrofitting, Replacement, or
        Retirement must be complete; and

    C.  The type of cooling appliance with which an existing
        cooling appliance shall be Retrofitted and/or Replaced; and

6.  All information regarding required personnel training
    including, but not limited to:

    A.  The name of each employee subject to training
        requirements under the Recycling and Emissions
        Reduction Regulations and/or this Sixth Amendment;

    B.  A description of the training requirements for each
        employee;

    C.  The scheduled dates by which each employee must
        complete individual training requirements; and

    D.  The date each such training requirement is successfully
        completed for each employee;

7.  Available historical records and data regarding these categories
    of information shall be input into RCM system.

b.  BP Products shall ensure that the RCM System has the functionality to

provide notifications in a timely manner to appropriate personnel at the

Texas City Facility regarding any individual duties and/or

responsibilities they may have to ensure compliance with the Recycling

and Emissions Reduction Regulations and this Sixth Amendment. This

functionality shall include timely notifications regarding impending

deadlines for required ODS-Leak repairs, submission of Replacement,

Retrofit, and/or Retirement plans, completion of Replacement, Retrofit,

and/or Retirement work requirements, and/or reporting requirements. This functionality shall also include timely notifications regarding impending deadlines to complete other individual obligations, such as periodic training requirements. The RCM System shall have the functionality to provide such notifications upon entry of "triggering" data (such as entry of a non-complying leak rate or failed verification test for individual cooling appliances) and based on the approach and passage of scheduled calendar dates for recurring tasks.

c. Any outstanding obligations to perform leak repairs, submit Replacement, Retrofit, and/or Retirement plans, and perform Replacement, Retrofit, and/or Retirement work shall be listed as open action items in the Texas City Facility's Traction database until completed.

vii. **Cooling Appliance Inventory Certification**. No later than 60 Days following the Date of Entry of the Sixth Amendment, BP Products shall submit an updated Appendix N that includes an itemized inventory to EPA of all cooling appliances (IPRs, CCAs, and any other cooling appliances) at the Texas City Facility that are regulated pursuant to the Recycling and Emissions Reduction Regulations. Upon submission, BP Products shall certify to EPA that this inventory is complete and accurate. This certification shall contain the verification statement required under sub-paragraph 24-A(B)viii.f. to be included in Annual CFC Reports. The inventory shall include at least the following information for each refrigerant circuit for each cooling appliance:

a. The general location of the cooling appliance within the Texas City Facility;

b. The appliance number;

c. The type of cooling appliance system;

d. The type of refrigeration duty performed by the cooling appliance (Industrial Process, Comfort Cooling, Commercial, or other);

e. The manufacturer of the cooling appliance;

f. The model number of the cooling appliance;

g. The serial number of the cooling appliance;

h. The type of refrigerant used in the cooling appliance; and

i. The full charge amount of each circuit within the cooling appliance.

viii. **Annual CFC Reports**. In lieu of the calendar quarterly reporting requirements of Section VIII, Paragraph 33 of the Consent Decree, as amended, by no later than one calendar year following the Date of Entry of the Sixth Amendment, BP Products shall begin submitting annual progress reports ("Annual CFC Reports") to EPA. Annual CFC Reports shall include the information required under Section VIII of the Consent Decree, as amended, as well as the following information:

a. A description of all actions completed over the previous calendar year to Retire, Retrofit, and/or Replace the HRU Chiller by the deadline specified in sub-paragraph 24-A(B)i.a., as well as the date each action was completed; a description of each new cooling appliance or other equipment installed to Replace or Retrofit the HRU Chiller; the type of Non-ODS refrigerant used to Retrofit or Replace the HRU Chiller; and

documentation showing that any refrigerant destroyed, reclaimed, recovered, and/or recycled was done so in accordance with the requirements of this Sixth Amendment and 40 C.F.R. Part 82;

b.  An itemized listing of each CCA that has been Retired, Replaced, and/or Retrofitted over the previous calendar year, as well as a description of the actions taken with respect to each such cooling appliance; the date each action was completed; a description of each new cooling appliance or other equipment installed to Replace or Retrofit the CCAs; the type of Non-ODS refrigerant used in the Retrofitted or Replaced cooling appliances; and documentation showing that any refrigerant destroyed, reclaimed, recovered, and/or recycled was done so in accordance with the requirements of this Sixth Amendment and 40 C.F.R. Part 82;

c.  A description of all ongoing activities to comply with the Retirement/Retrofit/Replacement requirements of sub-paragraph 24-A(B)i.;

d.  A description of the actions taken to comply with the Comprehensive ODS-Leak Check and Repair requirements as specified in sub-paragraph 24-A(B)iii.a.3 and 24-A(B)iii.b.4;

e.  A listing of the calculated leak rates for the HRU Chiller and each CCA listed in Appendix N (and any additional CCAs listed in the updated Appendix N required under sub-paragraph 24-A(B)vii) over the previous calendar year; and

f. Each Annual CFC Report shall contain the following certification signed

by a responsible corporate officer of BP Products:

"I, _____, certify under penalty of law that this
document and all attachments were prepared under my direction or
supervision in accordance with a system designed to assure that
qualified personnel properly gather and evaluate the information
submitted. Based on my inquiry of the person or persons who
manage the system, or those persons directly responsible for
gathering the information, the information submitted is, to the best
of my knowledge and belief, true, accurate, and complete. I am
aware that there are significant penalties for submitting false
information, including the possibility of fine and imprisonment for
knowing violations."

**14.** The Consent Decree is amended by adding the following new **Paragraph 24-B**

**(Asbestos Compliance Measures)** at the end of **Paragraph 24 (EPCRA Audits)** of the Consent

Decree (and also after Paragraph 24-A (CFC Compliance Measures) added by the Sixth

Amendment)):

## 24-B. Asbestos Compliance Measures:

**24-B(A) Definitions.** In addition to the definitions listed in Section IV of the Consent

Decree and Section III of this Sixth Amendment, the following shall apply to the

provisions of this Paragraph:

i. "Asbestos NESHAP" shall mean the National Emission Standard for Hazardous

Air Pollutants for Asbestos promulgated at 40 C.F.R. Part 61, subpart M

pursuant to Section 112 of the Clean Air Act, 42 U.S.C. § 7412; and

ii. "ACM" shall mean asbestos-containing materials.

## 24-B(B) Compliance Measures.

i. **Asbestos Compliance Manager.** By no later than the Date of Entry of the

Sixth Amendment, BP Products shall designate at least one full-time employee

73

to be the Asbestos Compliance Manager for the Texas City Facility. The Asbestos Compliance Manager shall assume overall accountability (*i.e.*, shall act as the "single point of accountability" or "SPA") for managing and overseeing the Texas City Facility's compliance with the Asbestos NESHAP. The Asbestos Compliance Manager's responsibilities shall include, but shall not be limited to, the following specific duties, responsibilities, and authorities:

a. The Asbestos Compliance Manager shall be familiar with all applicable federal, state, and local laws and regulations governing notifications, scheduling, removal, handling, transporting, disposal, training, and recordkeeping requirements for asbestos abatement activities, as well as general practices and procedures for detecting asbestos, sampling for asbestos, controlling release of asbestos, worker protection, and equipment handling and decontamination procedures;

b. The Asbestos Compliance Manager shall understand and be familiar with the requirements of the Asbestos Compliance Measures required under this Sixth Amendment;

c. By no later than six (6) months following the Date of Entry of the Sixth Amendment, the Asbestos Compliance Manager shall successfully complete and maintain current certification in the U.S. EPA/State-approved training courses and periodic refresher courses required by 40 C.F.R. § 61.145(c)(8), as well as for the disciplines listed at 40 C.F.R. Part 763, Subpart E, Appendix C - Asbestos MAP, in the categories of Contractor/Supervisor (which also allows one to perform as a Worker) and Inspector;

d. The Asbestos Compliance Manager shall be familiar with any renovation or demolition project undertaken at the Texas City Facility that could or does affect ACM;

e. The Asbestos Compliance Manager shall verify that all employees or contractors working on demolition or renovation activities are in current compliance with any licensing, certification, and training requirements imposed by federal, state, and local laws and regulations by contacting the appropriate Texas state agencies authorized to approve asbestos training;

f. The Asbestos Compliance Manager shall ensure that EPA and all applicable state and local air pollution control agencies receive asbestos-

74

related notifications and reports required under all applicable laws and regulations and under this Sixth Amendment in a timely manner;

g.  The Asbestos Compliance Manager shall manage and coordinate all of the Texas City Facility's internal activities relating to asbestos emissions control and compliance with applicable regulations;

h.  The Asbestos Compliance Manager shall ensure that asbestos-related inspections are conducted in accordance with the provisions of this Sixth Amendment and the Asbestos NESHAP before any demolition or removal work is performed at the Texas City Facility;

i.  The Asbestos Compliance Manager shall oversee maintenance of all records dealing with asbestos removal and disposal at the Texas City Facility required under applicable federal, state, and local laws, including all records required under this Sixth Amendment.  The Asbestos Compliance Manager shall also ensure that all information maintained in the Asbestos Compliance Database is current and up-to-date;

j.  The Asbestos Compliance Manager shall ensure that any samples from the Texas City Facility to determine the presence of ACM, are collected in accordance with the following EPA guidance documents: *Guidance for Controlling Asbestos-Containing Materials in Buildings* (EPA 560/5-85-024 (June 1985)); *Asbestos in Buildings: Simplified Sampling Scheme for Friable Surfacing Materials* (EPA 560/5-85-030a (Oct. 1985)), and *Guidelines for Asbestos NESHAP Demolition and Renovation Inspection Procedures (Revised)* (EPA 340/1/90-007 (Nov. 1990)); provided, however, that if any of the foregoing guidance documents are superseded or revised during the duration of this Sixth Amendment, samples shall be taken in accordance with the superseding or revised guidance documents.  Samples that are analyzed by, or at the request of BP Products for the Texas City Facility, shall be sent to an appropriately qualified laboratory that participates in a NVLAP or equivalent program;

k.  The Asbestos Compliance Manager shall be given full authority to carry out his/her responsibilities, including the authority to stop work; and

l.  The Asbestos Compliance Manager shall be generally available at the Texas City Facility at all times during normal business hours (excluding holidays and reasonable vacation) and additionally, as needed.  If the Asbestos Compliance Manager shall not be able to perform his/her duties for an extended period of time, BP Products shall provide an alternate Asbestos Compliance Manager as soon as possible that is capable of performing all duties, responsibilities, and authorities

required under this Paragraph until the original Asbestos Compliance
Manager is able to resume his/her position.

ii. **Supervisors**. By no later than one (1) year following the Date of Entry of the
Sixth Amendment, BP Products shall ensure that at least one full-time
supervisory employee (e.g., Asset Coordinator or Maintenance Supervisor) at
each unit within the Texas City Facility where ACM is located has successfully
completed the U.S. EPA-approved training courses and periodic refresher
courses required by 40 C.F.R. § 61.145(c)(8), as well as for the disciplines listed
at 40 C.F.R. Part 763, Subpart E, Appendix C - Asbestos MAP, in the categories
of Contractor/Supervisor (which also allows one to perform as a Worker) and
Inspector.

    a. The designated supervisory employees shall have the following
    additional specific duties, responsibilities, and authorities:

        1. The designated supervisory employee must be knowledgeable in
        the facilities and equipment of the Texas City Facility unit for
        which they are responsible;

        2. The designated supervisory employee must visually inspect the
        unit's equipment and facilities on a regular basis to determine if
        conditions warranting asbestos abatement activities, including
        any removal or demolition work, to manage or remove ACM are
        present;

        3. The designated supervisory employee must maintain oversight of
        any asbestos abatement work, including any removal or
        demolition work, being performed at the unit for which they are

responsible to ensure that it is conducted in accordance with the provisions of the Asbestos NESHAP and this Sixth Amendment;

4.  The designated supervisory employee must immediately take all necessary actions to correct any violations of the Asbestos NESHAP he/she discovers. If an immediate remedy is not possible, the designated supervisory employee shall stop all asbestos abatement activities, including any removal or demolition work, until such violations are reported to the Asbestos Compliance Manager and corrected;

5.  The designed supervisory employee shall be given full authority to carry out his/her responsibilities, including the authority to stop work; and

6.  The designed supervisory employee shall communicate with line employees on a regular basis to ensure that they are kept aware of areas and equipment within the unit that contains ACM.

b.  BP Products shall have the option to submit written certification to EPA, containing the certification statement required under sub-paragraph 24-B(B)viii.c., that a unit does not contain ACM insulation and may accordingly be designated as "ACM Insulation Free". For any unit(s) certified by BP Products as being ACM Insulation Free, the requirements of this sub-paragraph 24-B(B)ii. shall no longer apply.

iii.  **Asbestos Compliance Information Management System**. By no later than 180 Days following the Date of Entry of the Sixth Amendment, BP Products

shall begin operating an Asbestos Compliance Information Management System that shall be used to maintain all information at the Texas City Facility required by the Asbestos NESHAP and this Sixth Amendment.  The Asbestos Compliance Information Management System may be comprised of more than one database(s) and/or application(s).  Upon request by EPA or the United States, BP Products shall identify each database and/or application comprising the Asbestos Compliance Information Management System.

    a.  BP Products shall include at least the following information within the electronic Asbestos Compliance Information Management System:

        1.  All information regarding asbestos abatement, removal, and demolition activities including, but not limited to:

            A.  The dates such abatement, removal, and/or demolition work are scheduled for;

            B.  The dates such abatement, removal, and/or demolition are actually performed;

            C.  The nature of the abatement, removal, and/or demolition work performed;

            D.  The specific location within the Texas City Facility at which the abatement, removal, and/or demolition work shall be performed; and

            E.  The quantity of ACM involved in the abatement, removal, and/or demolition work performed;

        2.  All information regarding each asbestos-related inspection performed at the Texas City Facility including, but not limited to:

            A.  The dates such inspections are scheduled for;

            B.  The dates such inspections are actually performed;

      C. The specific location within the Texas City Facility at which the inspection shall be performed; and

      D. The nature of the inspections performed and any findings made;

3. All information regarding the disposal of ACM from the Texas City Facility including, but not limited to:

      A. The identity and location of any facility to which any ACM from the Texas City Facility shall be sent for disposal, handling, and/or treatment;

      B. The dates such ACM is sent to any facility for disposal, handling, and/or treatment;

      C. The quantity of ACM sent for disposal, handling, and/or treatment;

      D. The specific source unit and/or area within the Texas City Facility from which the ACM being sent for disposal, handling, and/or treatment was removed; and

      E. The manifest number and date of any EPA, state, and/or local manifest required for shipments of ACM;

4. All information regarding required asbestos-related personnel training including, but not limited to:

      A. The name of each employee subject to asbestos-related training requirements;

      B. A description of the training requirements for each employee;

      C. The scheduled dates by which each employee must complete individual training requirements; and

      D. The date each such training requirement is successfully completed for each employee;

5. Available historical abatement, removal, and demolition records and data shall be input into the Asbestos Compliance Information Management System.

b. BP Products shall ensure that the Asbestos Compliance Information Management System has the functionality to provide alerts or other notifications in a timely manner to appropriate personnel at the Texas City Facility regarding any individual duties and/or responsibilities they may have to ensure compliance with the Asbestos NESHAP and this Sixth Amendment. This functionality shall include timely alerts or other notifications regarding impending deadlines for required inspections, submissions of notifications, completion of asbestos abatement, removal, or demolition work requirements, and/or other reporting requirements. This functionality shall also include timely alerts or other notifications regarding impending deadlines to complete other individual obligations, such as periodic training requirements. The Asbestos Compliance Information Management System shall have the functionality to provide such alerts or other notifications upon entry of "triggering" data (such as entry of scheduled dates for asbestos abatement, removal, or demolition work) and based on the approach and passage of scheduled calendar dates for recurring tasks.

c. Any outstanding obligations to perform asbestos abatement, removal, or demolition work shall be listed as individual open action items in the Texas City Facility's Asbestos Compliance Information Management System until completed.

iv. **Notifications**. Following the Date of Entry of the Sixth Amendment, if BP Products becomes aware of or receives any information indicating that any

asbestos demolition and/or removal work being performed at the Texas City Facility does not comply with the Asbestos NESHAP, BP Products shall submit written notification of such non-compliance to EPA within 48 hours. This notification shall describe the nature of the work being performed, the location where such work is occurring within the Texas City Facility, the amount of ACM involved in the work being performed, the nature of the non-compliance, the duration of such non-compliance, and any remedial action taken. Nothing in this sub-paragraph is intended to limit or disqualify BP Products from consideration under EPA's Audit Policy or any applicable state audit policy, on the grounds that information was not discovered and disclosed voluntarily, regarding violations of the Asbestos NESHAP that BP Products has provided notification of pursuant to this sub-paragraph.

v. **Availability of Written Asbestos-Related Policies**. By no later than sixty (60) Days following the Date of Entry of the Sixth Amendment, BP Products shall ensure that current written asbestos policies and procedures for the Texas City Facility are readily available to all employees. Furthermore, these policies and procedures shall be given in either hard copy or electronic form to each employee and supervisor involved with asbestos activities at the Texas City Facility. Such policies and procedures shall address all of the asbestos-related requirements included in this Sixth Amendment, as well as the responsibilities of the Asbestos Compliance Manager, designated supervisory employees, and employees involved in asbestos-related work. These policies and procedures shall provide that both employees and contractors are encouraged to report any

violations of the Asbestos NESHAP to the Asbestos Compliance Manager or the designated supervisory employees for each unit with the Texas City Facility.

vi. **Replacement of ACM Insulation**. Following the Date of Entry of the Sixth Amendment, BP Products shall replace ACM insulation with non-ACM insulation as asbestos abatement, removal, and/or demolition work is conducted throughout the Texas City Facility. However, nothing herein is intended to require BP Products to fully replace all ACM insulation within a unit if BP determines that it is instead able to repair damaged ACM insulation.

vii. **Third-Party Asbestos Contractors**. No later than the Date of Entry of the Sixth Amendment, BP Products shall include a term in all contracts for any third-party contractors retained to perform asbestos abatement activities, including any asbestos demolition or removal work, at the Texas City Facility substantially similar to the following:

> The contractor's failure to adhere to the applicable Asbestos NESHAP requirements shall be deemed a material breach of this contract.

viii. **Annual Asbestos Reports**. In lieu of the calendar quarterly reporting requirements of Paragraph 33 of the Consent Decree, as amended, no later than one calendar year following the Date of Entry of the Sixth Amendment, BP Products shall begin submitting annual progress reports ("Annual Asbestos Reports") to EPA. Annual Asbestos Reports shall include the information required under Section VIII of the Consent Decree, as amended, as well as the following information:

a. A summary of all asbestos abatement, renovation, and removal work performed at the Texas City Facility over the preceding calendar year;

b. A listing of each employee and supervisor who has received the training required by this Sixth Amendment, a description of the training completed, the date such training was completed, the identity of the training provider, and, for each employee subject to the training requirements of this Paragraph, a copy of the certificate indicating that such training or refresher training was satisfactorily completed;

c. Each Annual Asbestos Report shall contain the following certification signed by a responsible corporate officer of BP Products:

"I, _____ ___ _____, certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

## V. PERMITTING REQUIREMENTS - SIXTH AMENDMENT

**15. Section VI (Permitting)** of the Consent Decree is amended by adding the following new **Section VI.A. (Permitting Requirements - Sixth Amendment)** at the end of Paragraph 27:

### VI.A. Permitting Requirements - Sixth Amendment

27-A. Where any compliance obligation under the Sixth Amendment requires BP Products to obtain a federal, state, or local permit or approval, BP Products shall submit

timely and complete applications and take all other actions necessary to obtain all such permits or approvals. BP Products may seek relief under the provisions of Section XIII of the Consent Decree (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, provided that BP Products has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

## VI. SUPPLEMENTAL ENVIRONMENTAL PROJECT - SIXTH AMENDMENT

**16. Section VII (Environmentally Beneficial Projects)** of the Consent Decree is amended by adding the following new **Section VII.A. (Supplemental Environmental Project - Sixth Amendment)** at the end of Paragraph 32:

### VII.A. Supplemental Environmental Project - Sixth Amendment

32.A. BP Products shall implement a Supplemental Environmental Project (referred to as the "Natural Gas Conversion SEP"). The Natural Gas Conversion SEP shall be completed within twenty-four (24) months after the Date of Entry of this Sixth Amendment in accordance with the workplan and schedule set forth within Appendix O. The objective and purpose of the Natural Gas Conversion SEP shall be to reduce diesel emissions and gasoline emissions from the fleet of vehicles owned and/or operated by the City of Texas City, Texas and the Texas City Independent School District (and possibly two additional contiguous school districts) by converting at least 62 heavy-duty diesel vehicles (costing approximately $38,700 per conversion) and at least 38 light-duty gasoline vehicles (costing approximately $18,500 per conversion) to either compressed natural gas ("CNG") or liquefied natural gas ("LNG") vehicles. Additionally, as part of

84

the Natural Gas Conversion SEP, BP Products will provide support for the converted vehicles by constructing at least four (4) CNG/LNG refueling stations (costing approximately 585,000 each), develop a temporary Service Center (costing approximately \$230,000) to provide necessary facilities for the conversion of the vehicles, and provide technical training for maintenance crews for the fleets. BP Products agrees to spend not less than six million dollars (\$6,000,000) to implement the Natural Gas Conversion SEP.

32.B. BP Products is responsible for the satisfactory completion of the Natural Gas Conversion SEP in accordance with the requirements of this Sixth Amendment. BP Products may use contractors or consultants in planning and implementing the Natural Gas Conversion SEP.

32.C. With regard to the Natural Gas Conversion SEP, BP Products certifies the truth and accuracy of each of the following to the best of BP Products' knowledge and belief:

  a. that all cost information provided to EPA in connection with EPA's approval of the Natural Gas Conversion SEP is complete and accurate;

  b. that, as of the date of executing this Sixth Amendment, BP Products is not required to perform or develop the Natural Gas Conversion SEP by any federal, state, or local law or regulation and is not required to perform or develop the Natural Gas Conversion SEP by agreement, grant, or as injunctive relief awarded in any other action in any forum;

85

    c. that the Natural Gas Conversion SEP is not a project that BP Products was planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Sixth Amendment;

    d. that BP Products has not received and shall not receive credit for the Natural Gas Conversion SEP in any other enforcement action; and

    e. that BP Products shall not receive any reimbursement for any portion of the Natural Gas Conversion SEP from any other person.

32.D. BP Products further certifies under penalty of law that it would have agreed to perform a comparably valued, alternative project other than a diesel emissions reduction Supplemental Environmental Project, if the Agency were precluded by law from accepting a diesel emissions reduction Supplemental Environmental Project.

32.E. Natural Gas Conversion SEP Completion Report. No later than 30 Days after the date set for completing the Natural Gas Conversion SEP, BP Products shall submit a Natural Gas Conversion SEP Completion Report to the United States, in accordance with Paragraph 82.A of the Consent Decree (Notice), as amended. The Natural Gas Conversion SEP Completion Report shall contain the following information:

    a. a detailed description of the Natural Gas Conversion SEP as implemented;

    b. a description of any problems encountered in completing the Natural Gas Conversion SEP and the solutions thereto;

    c. an itemized list of all eligible Natural Gas Conversion SEP costs expended;

    d. certification that the Natural Gas Conversion SEP has been fully implemented pursuant to the provisions of this Sixth Amendment; and

e. a description of the environmental and public health benefits resulting from implementation of the Natural Gas Conversion SEP (with a quantification of the benefits and pollutant reductions, if feasible).

32.F. EPA may, in its sole discretion, require information in addition to that described in the preceding sub-paragraph, in order to evaluate BP Products' completion report.

32.G. After receiving the Natural Gas Conversion SEP Completion Report, the United States shall notify BP Products whether or not it has satisfactorily completed the Natural Gas Conversion SEP. If BP Products has not completed the Natural Gas Conversion SEP in accordance with this Sixth Amendment, stipulated penalties may be assessed under Paragraph 49.A of the Consent Decree, as amended by the Sixth Amendment.

32.H. Disputes concerning the satisfactory performance of the Natural Gas Conversion SEP and the amount of eligible Natural Gas Conversion SEP costs may be resolved under Section XIV of the Consent Decree (Retention of Jurisdiction/Dispute Resolution). No other disputes arising under this Section shall be subject to Dispute Resolution.

32.I. Each submission required under this Section shall be signed by an official with knowledge of the Natural Gas Conversion SEP and shall bear the certification language set forth in Paragraph 34 of the Consent Decree.

32.J. Any public statement, whether oral or written, in print, film, or other media, made by BP Products making reference to the Natural Gas Conversion SEP under this Sixth Amendment to the Consent Decree shall include the following language:

> This project was undertaken in connection with the settlement of an
> enforcement action, United States v. BP Exploration & Oil Co., Civil No.
> 2:96 CV 095 RL (N.D. Ind.), taken on behalf of the U.S. Environmental
> Protection Agency under the Clean Air Act.

32.K. If BP Products satisfactorily completes the Natural Gas Conversion SEP

but does not spend the full amount of the SEP cost estimate set forth in sub-paragraph 32.A.

above, BP Products shall either: a) expand the scope of the Natural Gas Conversion SEP so as to

retrofit additional diesel vehicles or gasoline vehicles in the Texas City and/or City of La

Marque, Texas vehicle fleets or construct additional refueling stations, or b) request that EPA

determine whether the amount remaining could reasonably be applied toward another SEP. If

EPA determines that the amount remaining could reasonably be applied toward another SEP, BP

Products shall submit a proposal to EPA that shall be subject to EPA approval in accordance

with sub-paragraphs 33.F. and 33.G. of the Consent Decree, as amended.

32.L. For Federal Income Tax purposes, BP Products agrees that it shall neither

capitalize into inventory or basis nor deduct any costs or expenditures incurred in performing the

Natural Gas Conversion SEP.

## VII. REPORTING AND RECORDKEEPING - SIXTH AMENDMENT

**17. Section VIII (Reporting and Recordkeeping), Paragraph 33** of the Consent

Decree is amended by adding the following new sub-paragraphs 33.A – 33.G. at the end thereof:

33.A. Texas City Semi-Annual Progress Reports. With respect to the Texas City
Facility, in lieu of the above calendar quarterly reporting requirement, no later than 180
days after the Date of Entry of the Sixth Amendment, BP Products shall submit to EPA
an initial Semi-Annual Progress Report regarding the Texas City Facility that contains
the information required under Paragraph 33 of the Consent Decree, as amended, for the
two previous Calendar Quarters. BP Products shall submit subsequent Semi-Annual

Progress Reports regarding the Texas City Facility to EPA that shall be due by no later than February 15th and August 15th of each calendar year following the Date of Entry of the Sixth Amendment. Semi-Annual Progress Reports shall be subject to the certification requirements of Paragraph 34 of the Consent Decree.

33.B. In addition to the information required under Paragraph 33, Semi-Annual Progress Reports shall also include a general description of the following information regarding the requirements of the Consent Decree, as amended: the status of any construction or compliance measures; the completion of milestones; any problems encountered or anticipated, together with implemented or proposed solutions; the status of any permit applications; and any operation and maintenance activities performed. Semi-annual Progress Reports shall also include the following specific information with respect to Paragraph 19 of the Consent Decree, as amended:

i. With respect to the Management of Change requirements of sub-paragraphs

19.G.i. and 19.G.ii., BP Products shall include:

- a. A description of BP Products' efforts under sub-paragraph 19.G.i. to implement the required revisions to the Texas City Facility's management of change policies, procedures, and guidance documents; and

- b. A description of BP Products' efforts under sub-paragraph 19.G.ii. to train all employees and contractors at the Texas City Facility who lead management of change reviews and/or analyses on the revised policies, procedures, and guidance documents.

ii. With respect to the Cooling Tower Water Monitoring and Repair Program set

forth at sub-paragraph 19.W., BP Products shall include:

- a. A description of any changes in operation made at the Texas City Facility that subject a previously exempt Cooling Tower System to the requirements of the Cooling Tower Water Monitoring and Repair Program, as required under sub-paragraph 19.W.i.b.;

89

b. All sample results and accompanying data from the grab sampling required by sub-paragraph 19.W.iii.c. for the previous two Calendar Quarters;

c. A summary of the leak monitoring data for the previous two Calendar Quarters, including the number of Leaks identified;

d. If applicable, the date a Leak was identified, the date the heat exchanger Leak source was identified, the date the Leak was repaired, and an explanation of the actions taken to repair the Leak;

e. If applicable, an explanation of the reasons for the delayed repair of any Leak, the interim measures taken, as required under sub-paragraph 19.W.iv.b, and the date of anticipated repair. If the delay is based on startup and shutdown emissions under sub-paragraph 19.W.iv.a.(2), the initial and subsequent monthly calculations of the potential Cumulative LEAK Emissions; and

f. The date confirmation monitoring was conducted and whether it indicated that the Leak was successfully repaired.

iii. With respect to the Gravity Sewer Integrity Testing and Repair requirements

set forth at sub-paragraph 19.AA.ii.a., BP Products shall include:

a. A listing of all combined wastewater treatment system segments inspected and/or repaired during the previous two Calendar Quarters;

b. The type of inspection method that shall be or was utilized;

c. The nature of any defects found;

d. A schedule for repairing any defects found; and

e. The method that shall be or was used to complete such repairs.

iv. With respect to the Benzene Product Line Raising requirements set forth

at sub-paragraph 19.BB., BP Products shall:

a. Identify any Benzene Product Lines raised during the previous two Calendar Quarters; and

b. The anticipated work to be performed over the upcoming two Calendar Quarters to raise additional Benzene Product Lines.

33.C.  BP Products shall submit to EPA one copy of each Semi-Annual Progress Report and all accompanying data in hard-copy paper and one copy of each Semi-Annual Progress Report and all required accompanying data in a widely-recognized electronic format (such as .pdf or Microsoft® Excel).

33.D.  The reporting requirements of the Consent Decree, as amended, do not relieve BP Products of any reporting obligations required by the Clean Air Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

33.E.  Any information provided pursuant to the Consent Decree, as amended, may by used by the United States in any proceeding to enforce the provisions of the Consent Decree, as amended, and as otherwise permitted by law.

33.F.  Review of Deliverables.  Where any provision of the Sixth Amendment specifically requires the submission of a plan, notification, report, procedure, protocol, or other deliverable (hereinafter collectively referred to as a "submission") by BP Products to be "subject to EPA approval" or "subject to EPA comment," the submission shall be subject to the requirements of this sub-paragraph and sub-paragraph 33.G.  For each submission, BP Products shall submit one copy of the submission to EPA along with all accompanying data in hard-copy paper and one copy of the submission to EPA along with all accompanying data in a widely-recognized electronic format (such as .pdf or Microsoft® Excel).

    i.       Submissions Subject to EPA Approval.

          a.      For submissions subject to EPA approval, EPA may approve the submission or decline to approve it, in whole or in part, and may provide

91

written comments. Upon receiving EPA's written comments or written notice that EPA disapproves a submission, in whole or in part, BP Products shall have either: (a) 45 Days to alter the submission consistent with EPA's written comments or notice of disapproval and provide the submission to EPA for final approval, or (b) 60 Days from the date of receiving EPA's approval or disapproval to invoke dispute resolution under Section XIV of the Consent Decree. If EPA disapproves a submission, in whole or in part, it must state in writing the basis for such disapproval. Solely with respect to the submissions provided for under sub-paragraphs 19.N.ii.a, 19.W.iii.c(1), and 19.Y.ii.b., if EPA does not respond in writing within 120 Days of the submission, the request shall be deemed disapproved and BP Products shall have the right to invoke Dispute Resolution under Section XIV of the Consent Decree.

ii.    Submissions Subject to EPA Comment.

a.    For submissions subject to EPA comment, EPA may provide written comments on the submission, in whole or in part, or EPA may decline to comment. If EPA provides written comments within 60 Days of receiving a submission, BP Products shall within 45 Days of receiving such comments either: (a) alter and implement the submission consistent with EPA's written comments, or (b) submit the matter for dispute resolution under Section XIV of the Consent Decree.

b.    After 60 Days from the date of such submission, EPA may nonetheless thereafter provide written comments requiring changes to the

92

submission which BP Products shall implement unless implementation of
the written comments would be unduly burdensome given the degree to
which BP Products has proceeded with implementing the deliverable or
otherwise unreasonable. If BP Products determines that implementation
of the written comments is unduly burdensome or otherwise unreasonable,
it shall notify EPA . Within 60 Days of receiving BP Products' position
EPA may either accept BP Products' position or invoke dispute resolution
pursuant to Section XIV of the Consent Decree.

33.G.  Except as specifically otherwise provided herein, upon receipt of EPA's final
approval of a submission, upon the expiration of 60 Days from the date of a submission subject
to EPA comment, or upon completion of any dispute resolution process under Section XIV of the
Consent Decree regarding a submission, BP Products shall implement the submission in
accordance with the requirements and schedule within the approved submission.

## VIII.  CIVIL PENALTY - SIXTH AMENDMENT

**18.  Section IX (Civil Penalty), Paragraph 35** of the Consent Decree is amended by
adding the following new sub-paragraphs 35.A and 35.B. at the end thereof:

35.A.  Within thirty (30) Days after the Effective Date of the Sixth Amendment,
BP Products shall pay the sum of twelve million dollars ($12,000,000) as a civil penalty,
together with interest accruing from the date on which the Sixth Amendment is lodged
with the Court, at the rate specified in 28 U.S.C. § 1961 as of the Date of Lodging of the
Sixth Amendment.

35.B.  BP Products shall pay the civil penalty due by FedWire Electronic Funds
Transfer ("EFT") to the U.S. Department of Justice in accordance with written

instructions to be provided to BP Products, following lodging of this Sixth Amendment

of the Consent Decree, by the Financial Litigation Unit of the U.S. Attorney's Office for

the Northern District of Indiana.  At the time of payment, BP Products shall send a copy

of the EFT authorization form and the EFT transaction record, together with a transmittal

letter, which shall state that the payment is for the civil penalty owed pursuant to this

Sixth Amendment of the Consent Decree in <u>United States v. BP Exploration & Oil Co.</u>,

(Civil No. 2:96 CV 095 RL) to the United States, in accordance with Paragraph 82.A

(Notices), by email to <u>acctsreceivable.CINWD@epa.gov</u>, and by mail to:

> U.S. Environmental Protection Agency
> Fines and Penalties
> Cincinnati Finance Center
> P.O. Box 979077
> St. Louis, MO  63197-9000

The EFT authorization form, EFT transaction record, and transmittal letter shall all

reference the civil action number, U.S. Attorney File Number, and DOJ case number:

90-5-2-1-08741.

**19.**  Paragraph 36 is amended by adding the following new sub-paragraph 36.A. at the

end thereof:

> 36.A.  BP Products shall not deduct any penalties paid under this Sixth
>
> Amendment pursuant to this Section, Section X (Stipulated Penalties), and/or Section
>
> X.A. (Additional Stipulated Penalties – Sixth Amendment) in calculating its federal tax.

## IX.  <u>STIPULATED PENALTIES</u>

**20.  Section X (Stipulated Penalties), Paragraph 44** (Paragraph 19 – Requirements for

Benzene Waste NESHAP Program Enhancements) of the Consent Decree is amended by adding

the following new sentences at the end of the first paragraph of Paragraph 44:

Subject to the provisions of Section XI of the Sixth Amendment (Effect of Settlement –
Sixth Amendment) and Section XV (Effect of Settlement/Reservation of Rights) of the
Consent Decree, as amended, the stipulated penalties provided for in this Consent
Decree, as amended, shall be in addition to any other rights, remedies, or sanctions
available to the United States for BP Products' violations of this Consent Decree, as
amended, or of applicable law. Where a violation of this Consent Decree, as amended, is
also a violation of the Clean Air Act or its implementing regulations, BP Products shall
be allowed a credit, for any stipulated penalties actually paid, against any statutory
penalties imposed for such violation.

**21. Section X (Stipulated Penalties) Paragraph 44** (Paragraph 19 – Requirements for
Benzene Waste NESHAP Program Enhancements) of the Consent Decree is further amended by
adding the following new sub-paragraphs 44.N – 44.CC. at the end thereof:

> 44.N. Facility Compliance Status:
>
> > i. For failure to comply with the 6 Mg Option required by sub-paragraph
> > 19.A.iii. after January 1, 2008:
> >
> > > $125,000 for each 10% Mg increment by which the 6 Mg Option
> > > uncontrolled benzene limit is exceeded.
> >
> > ii. For failure to comply with the Organic and Aqueous Benzene Waste
> > control requirements of sub-paragraph 19.A.iv.:
> >
> > > $12,500 per month per uncontrolled waste management unit
>
> 44.O. Waste Stream Audit:
>
> > i. For failure to complete the BWON Review and Verification Audit
> > requirements of sub-paragraph 19.D.i:
> >
> > > $15,000 per month overdue
> >
> > ii. For failure to identify waste streams as required by sub-paragraph
> > 19.D.i.a:

$5,000 per waste stream

iii. For failure to accurately review, analyze, and/or verify waste stream characteristics as required by sub-paragraph 19.D.i.b:

$5,000 per waste stream

44.P.  For failure to install and/or operate dual carbon canisters as required by sub-paragraph 19.F.iv:

$10,000 per week, per carbon canister

44.Q.  For failure to modify and/or implement any requirement of the Management of Change procedures as required under sub-paragraphs 19.G.i. and 19.G.ii.:

$5,000 per month overdue

44.R.  For failure to conduct sampling at the Texas City Facility in accordance with the requirements of sub-paragraph 19.N, as amended by sub-paragraphs 19.N.i.a and 19.N.ii.a:

> $7,500 per week, per stream, or $45,000 per quarter, per stream, whichever is greater, but not to exceed $225,000 per quarter.

44.S.  Measurement of Secondary Seal Gaps for Oil-Water Separators

i. For failure to conduct any required measurement of oil-water separator unit floating roofs as required by sub-paragraph 19.P.iv.a.:

$5,000 per month, per unit.

ii. For failure to conduct any required repair of oil-water separator unit floating roofs as required by sub-paragraph 19.P.iv.b.:

$5,000 per week, per unit

44.T.  For failure to perform any requirement of a Root Cause Failure Analysis required by sub-paragraph 19.V.iv.a.:

$2,500 per week, per requirement

44.U.  For failure to comply with any requirement of the Cooling Tower Water Monitoring and Repair Program of sub-paragraph 19.W., per cooling tower, per requirement:

| Period of Delay | Penalty Per Day |
|---|---|
| 1-30 Days | $1,000 |
| 31-60 Days | $3,500 |
| Beyond 60th Day | $5,000 |

44.V. <u>EOL and EBU Monitoring</u>:

    i. For failure to install and/or operate any gas chromatograph technology and/or flow rate monitors as required under sub-paragraph 19.X.i.:

        $10,000 per gas chromatograph or flow rate monitor per month

    ii. For failure to conduct the QA/QC audit required under sub-paragraph 19.X.i.d.:

        $1,000 per week overdue

    iii. For failure to perform any DIAL monitoring event in accordance with the requirements of sub-paragraph 19.X.ii.:

        $25,000 per month per missed monitoring event

44.W. <u>Control of Wastewater Overflows</u>:

    i. For failure to install the West Plant controls required under sub-paragraph 19.Y.i.:

        $25,000 per month overdue

    ii. For failure to complete the Overflow Study required under sub-paragraph 19.Y.ii.:

        $15,000 per month overdue

    iii. For failure to install the level indicators or improved pumping capacity as indicated in sub-paragraph 19.Y.iii. and Appendix P:

        $5,000 per month, per missed lift station or dry weather sump

44.X. [Reserved]

44.Y. Enhanced Preventative Maintenance:

i. For failure to perform the Gravity Sewer Integrity Testing required under sub-paragraph 19.AA.ii.a.:

| Period of Noncompliance | Penalty per Day |
|---|---|
| 1st through 30th Day | $1,000 |
| 31st through 60th Day | $2,500 |
| Beyond 60th Day | $3,500 |

ii. For failure to perform timely repairs to the Gravity Sewer in accordance with the repair plan schedule as required under sub-paragraph 19.AA.ii.a.3:

$2,500 per week per overdue repair

iii. For failure to perform timely inspections or repairs of controlled sewer access points as required under sub-paragraph 19.AA.ii.b.:

$500 per missed inspection; and
$500 per week, for failure to repair

44.Z. For failure to raise any Benzene Product Line as required under sub-paragraph 19.BB.:

$10,000 per month overdue, per line

44.AA. For failure to complete any phase of the Benzene Waste Operations NESHAP Compliance Audit as required under sub-paragraph 19.CC.:

$10,000 per month overdue

44.BB. For failure to install any geodome tank cover as required under sub-paragraph 19.DD.:

$5,000 per month overdue, per tank

44.CC. For failure to complete, timely submit, and/or fully implement any of the submission requirements in sub-paragraph 19.EE:

| Period of Noncompliance | Penalty per Day |
|---|---|
| 1st through 30th Day | $1,500 |

| | |
|---|---|
| 31st through 60th Day | $3,500 |
| Beyond 60th Day | $5,000 |

**22.  Section X (Stipulated Penalties), Paragraph 49 (Paragraph 29 – Requirements for SEPs)** of the Consent Decree is amended by adding the following new sub-paragraph 49.A. at the end thereof.

49.A.  If BP Products fails to satisfactorily complete the Natural Gas Conversion SEP in accordance with the requirements and deadlines set forth in Section VII.A. of the Consent Decree, as amended, BP Products shall pay stipulated penalties for each Day for which it fails to satisfactorily complete the Natural Gas Conversion SEP, as follows:

| Period of Noncompliance | Penalty per violation per Day |
|---|---|
| 1st through 30th Day | $1,000 |
| 31st through 60th Day | $3,500 |
| Beyond 60th Day | $5,000 |

**23.  Section X (Stipulated Penalties)** of the Consent Decree is amended by adding the following new **Section X.A. (Additional Stipulated Penalties – Sixth Amendment)** at the end of Paragraph 50:

### X.A.  ADDITIONAL STIPULATED PENALTIES – SIXTH AMENDMENT

50-A.  BP Products shall also be liable for stipulated penalties to the United States for violations of the Consent Decree, as amended, as specified below, unless excused under Section XIII (Force Majeure).  A violation includes failing to perform any obligation required by the terms of the Consent Decree, as amended, including any work plan or schedule approved under the Consent Decree, as amended, according to all

applicable requirements of this Consent Decree, as amended, and within the specified time schedules established by or approved under this Consent Decree, as amended.

50-B.  Late Payment of Civil Penalty.  If BP Products fails to pay when due the civil penalty required to be paid under **Section IX (Civil Penalty), Paragraph 35.A.**, BP Products shall pay a stipulated penalty of $5,000 per Day for each Day that the payment is late.

50-C.  Paragraph 24-A: CFC Compliance Measures.

A.  The following stipulated penalties shall accrue per Day per violation for any noncompliance with the provisions of sub-paragraphs 24-A(B)i – 24-A(B)vii (Compliance Measures):

| Period of Noncompliance | Penalty per appliance per Day or violation per Day |
| --- | --- |
| 1st through 30th Day | $1,500 |
| 31st through 60th Day | $3,500 |
| Beyond 60th Day | $5,000 |

B.  The following stipulated penalties shall accrue per Day per violation for any noncompliance with the Annual CFC Report requirements of sub-paragraph 24-A(B)viii:

| Period of Noncompliance | Penalty per violation per Day |
| --- | --- |
| 1st through 30th Day | $750 |
| Beyond 31st Day | $1,500 |

50-D. Paragraph 24-B: Asbestos Compliance Measures.

A. The following stipulated penalties shall accrue per Day per violation for any noncompliance with the provisions of sub-paragraphs 24-B(B)i – 24-B(B)vii (Compliance Measures):

| Period of Noncompliance | Penalty per violation per Day |
| --- | --- |
| 1st through 30th Day | $1,500 |
| 31st through 60th Day | $3,500 |
| Beyond 60th Day | $5,000 |

B. The following stipulated penalties shall accrue per Day per violation for any noncompliance with the Annual Asbestos Report requirements of sub-paragraph 24-B(B)viii:

| Period of Noncompliance | Penalty per violation per Day |
| --- | --- |
| 1st through 30th Day | $750 |
| Beyond 31st Day | $1,500 |

## X. **INFORMATION COLLECTION AND RETENTION - SIXTH AMENDMENT**

**24.** Until five years after the termination of the Sixth Amendment, BP Products shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate to BP Products' performance of its obligations under the Sixth Amendment. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States, BP Products shall provide

copies of any documents, records, or other information required to be maintained under this Paragraph.

**25.** At the conclusion of the information-retention period provided in the preceding Paragraph, BP Products shall notify the United States at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States, BP Products shall deliver any such documents, records, or other information to EPA. BP Products may assert that certain documents, records, or other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If BP Products asserts such a privilege, it shall provide a privilege log providing the following information: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of each author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by BP Products. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree or Sixth Amendment shall be withheld on grounds of privilege.

**26.** BP Products may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that BP Products seeks to protect as CBI, it shall follow the procedures set forth in 40 C.F.R. Part 2.

**27.** This Consent Decree and Sixth Amendment in no way limit or affect any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal or state laws, regulations, or permits, nor does either limit or affect any duty or

obligation of BP Products to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XI. **EFFECT OF SETTLEMENT - SIXTH AMENDMENT**

**28.** Entry of the Sixth Amendment shall resolve all civil liability of BP Products to the United States for violations at the Texas City Facility of Paragraph 19.A.i. of the Consent Decree (Facility Current Compliance Status) that occurred prior to December 31, 2007. In addition, entry of the Sixth Amendment resolves the civil claims of the United States for violations at the Texas City Facility alleged in the Supplemental Complaint filed by the United States concurrently with the lodging of the Sixth Amendment.

**29.** The United States reserves all legal and equitable remedies available to enforce the provisions of the Sixth Amendment, except as specifically stated in Paragraph 28 of the Sixth Amendment. The Sixth Amendment shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the Clean Air Act or implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in Paragraph 28.

**30.** The Sixth Amendment does not limit or affect the rights of BP Products or of the United States against any third parties, not party to this Sixth Amendment, nor does it limit the rights of third parties, not parties to this Sixth Amendment, against BP Products, except as otherwise provided by law.

**31.** The Sixth Amendment shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Sixth Amendment.

**32.** Unless specifically modified or amended herein, the existing terms and requirements

of the Consent Decree remain in effect and fully applicable to the provisions of the Sixth

Amendment.

## XII. **GENERAL PROVISIONS - SIXTH AMENDMENT**

**33. Section XVI (General Provisions), Paragraph 82 (Notice)** is amended by adding

the following new sub-paragraph 82.A at the end thereof:

82.A. Unless otherwise specified herein, whenever notifications, submissions, or

communications are required by the Sixth Amendment, they shall be made in writing and

addressed as follows:

To the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
**Re: DOJ No. 90-5-2-1-08741**

To EPA:

Director, Air Enforcement Division
Office of Civil Enforcement
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Ave., N.W.
Mail Code 2242-A
Washington, D.C. 20460

with a hard copy to:

Director, Air Enforcement Division
Office of Civil Enforcement
c/o Matrix New World Engineering, Inc.
120 Eagle Rock Ave., Suite 207
East Hannover, N.J. 07936-3159

and an electronic copy in .pdf or Microsoft® Excel format to:

csullivan@matrixnewworld.com
braby.sharon@epa.gov

Associate Director
Aix/Toxics & Inspection Coordination Branch
Compliance Assurance and Enforcement Division
U.S. Environmental Protection Agency - Region 6
1445 Ross Ave.
Dallas, Texas  75202-2733

and

To BP Products:

James A. Nolan, Jr.
Managing Attorney
BP America Inc.
4101 Winfield Road
Mail Code 4 West
Warrenville, Illinois 60555

and

Treena Piznar
Water and Waste Team Leader
BP Products North America
Texas City Refinery
Amegy Building, Suite 200, Room 214
Texas City, Texas  77590

## XIII.  **TERMINATION OF SIXTH AMENDMENT**

**34. Section XVII (Termination) Paragraph 86.C.** is amended by adding the following

new sub-paragraphs 86.C.i.-86.C.iii. at the end thereof:

i.  With respect to the Texas City Facility, in lieu of the requirements and

timeframe contained in Paragraph 86.C. for terminating Paragraph 19 of the Consent

Decree, the following requirements and timeframe for termination shall apply.  After BP

Products has: 1) completed the requirements of Paragraph 19 of the Consent Decree, as

amended by the Sixth Amendment; 2) has thereafter maintained satisfactory compliance

with all requirements of Paragraph 19 of the Consent Decree, as amended by the Sixth Amendment, until no earlier than January 1, 2013; 3) has satisfactorily complied with all other requirements of the Sixth Amendment, including those relating to the SEP required by Section VII.A. and Appendix O of the Sixth Amendment; and 4) has paid the civil penalty and any accrued stipulated penalties as required by the Sixth Amendment, BP Products may serve upon the United States, together with all necessary supporting documentation, a Request for Termination of Paragraph 19 of the Consent Decree, as amended, and the Sixth Amendment stating that BP Products has satisfied those requirements.

ii. Following receipt by the United States of BP Products' Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether BP Products has satisfactorily complied with the requirements for termination of Paragraph 19 of the Consent Decree, as amended, and the Sixth Amendment. If the United States agrees that Paragraph 19 of the Consent Decree, as amended, and the Sixth Amendment may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating Paragraph 19 of the Consent Decree, as amended, and the Sixth Amendment.

iii. If the United States does not agree that Paragraph 19 of the Consent Decree, as amended, or the Sixth Amendment may be terminated, BP Products may invoke Dispute Resolution under Section XIV of the Consent Decree. In any such proceeding, BP Products shall bear the burden of proof that Paragraph 19 of the Consent Decree, as amended, and the Sixth Amendment should be terminated. However, BP Products shall not seek Dispute Resolution of any dispute regarding termination, under Section XIV of

the Consent Decree, until no earlier than 60 days after service of its Request for

Termination upon the United States.

**35.**     **Section XVII (Termination) Paragraph 86** is amended by adding the following

new sub-paragraph 86.H at the end of sub-paragraph 86.G:

86.H.  **For Paragraphs 24-A (CFC Compliance Measures) and/or 24-B**

**(Asbestos Compliance Measures)**:  After BP Products has: 1) completed the

requirements of Paragraphs 24-A and 24-B of the Consent Decree, as amended by the

Sixth Amendment; 2) has thereafter maintained satisfactory compliance with all

requirements of Paragraphs 24-A and/or 24-B of the Consent Decree, as amended by the

Sixth Amendment, until no earlier than December 31, 2011; and 3) has paid the civil

penalty and any accrued stipulated penalties as required by the Sixth Amendment, BP

Products may serve upon the United States, together with all necessary supporting

documentation, a Request for Termination of Paragraph(s) 24-A and/or 24-B of the

Consent Decree, as amended, stating that BP Products has satisfied those requirements.

Following receipt by the United States of BP Products' Request for Termination, the

Parties shall follow the procedures set forth in sub-paragraphs 86.C.ii. and 86.C.iii of the

Consent Decree, as amended by the Sixth Amendment.

## XIV.  OBLIGATIONS PRIOR TO EFFECTIVE DATE OF SIXTH AMENDMENT

**36.**  Obligations of BP Products under the provisions of the Sixth Amendment to perform

existing requirements of the Consent Decree or to perform requirements scheduled to commence

on or before the Date of Entry of the Sixth Amendment shall be legally enforceable upon the

Effective Date of the Sixth Amendment.  Upon the Effective Date of the Sixth Amendment, the

stipulated penalty provisions of the Sixth Amendment shall be retroactively enforceable with

regard to any and all violations of the Sixth Amendment, and in particular sub-paragraph
19.A.iii. of the Consent Decree, as amended by the Sixth Amendment, that have occurred prior
to the Effective Date of the Sixth Amendment, provided that payment of such stipulated
penalties that may have accrued prior to the Effective Date of the Sixth Amendment may not be
collected by the United States unless and until the Sixth Amendment is entered by the Court.

## XV.  PUBLIC PARTICIPATION – SIXTH AMENDMENT

**37.** The Sixth Amendment shall be lodged with the Court for a period of not less than 30
Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States
reserves the right to withdraw or withhold its consent if the comments regarding the Sixth
Amendment disclose facts or considerations indicating that the Sixth Amendment is
inappropriate, improper, or inadequate.  BP Products consents to entry of the Sixth Amendment
without further notice and agrees not to withdraw from the Sixth Amendment or oppose entry of
the Sixth Amendment by the Court or to challenge any provision of the Sixth Amendment,
unless the United States has notified BP Products in writing that it no longer supports entry of
the Sixth Amendment.

## XVI.  SIGNATORIES – SIXTH AMENDMENT

**38.** Each undersigned representative of BP Products and the Assistant Attorney General
for the Environment and Natural Resources Division of the Department of Justice certifies that
he or she is fully authorized to enter into the terms and conditions of this Sixth Amendment and
to execute and legally bind the Party he or she represents to this document.

**39.** The Sixth Amendment may be signed in counterparts, and its validity shall not be
challenged on that basis.  BP Products agrees to accept service of process by mail with respect to
all matters arising under or relating to the Sixth Amendment and to waive the formal service

requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XVII. INTEGRATION – SIXTH AMENDMENT

**40.** This Sixth Amendment constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Sixth Amendment and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Except for the Consent Decree, no other document, nor any representation, inducement, agreement, understanding, or promise constitutes any part of the Sixth Amendment or the settlement it represents, nor shall it be used in construing the terms of the Sixth Amendment.

## XVIII. EFFECTIVE DATE – SIXTH AMENDMENT

**41.** The Effective Date of this Sixth Amendment shall be the date upon which this Sixth Amendment is entered by the Court or a motion to enter this Sixth Amendment is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that BP Products hereby agrees that it shall be bound to perform existing duties and duties scheduled to occur prior to the Effective Date of the Sixth Amendment. In the event the United States withdraws or withholds consent to this Sixth Amendment before entry, or the Court declines to enter the Sixth Amendment, then the preceding requirement to comply with the requirements of the Sixth Amendment scheduled to occur prior to the Effective Date shall terminate.

## XIX. FINAL JUDGMENT

**42.** Upon approval and entry of this Sixth Amendment by the Court, this Sixth Amendment shall constitute a final judgment of the Court as to the United States and BP

Products. The Court finds that there is no just reason for delay and therefore enters this

judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XX. **APPENDICES**

**43.** The following appendices are attached to and incorporated as part of this Sixth

Amendment:

> "**Appendix K**" is the list of Cooling Tower Systems at the Texas City Facility
> subject to the Cooling Tower Water Monitoring and Repair Program;
>
> "**Appendix L**" is the list of Benzene Product Lines to be raised at the Texas City
> Facility;
>
> "**Appendix M**" is the list of designated Texas City Facility tanks on which
> geodome covers will be installed;
>
> "**Appendix N**" is the list of IPR and Comfort Cooling Appliances subject to the
> CFC Compliance Measures; and
>
> "**Appendix O**" is the Natural Gas Conversion SEP.
>
> "**Appendix P**" is the Dry Weather Sump Reliability Project Scope

## **ORDER**

Before the taking of any testimony, without adjudication of any issue of fact or law, and

upon the consent and agreement of the Parties, it is hereby ORDERED, ADJUDGED and

DECREED that the foregoing Sixth Amendment to the Consent Decree is hereby approved and

entered as a final order of this court.

Dated and entered this _____ Day of _____, 200___ .

                    /s/ Rudy Lozano

Rudy Lozano
Senior United States District Judge

111

Subject to the notice and comment provisions of 28 C.F.R. § 50.7, THE UNDERSIGNED PARTIES enter into this Sixth Amendment to the Consent Decree entered in the matter of United States, et al., v. BP Exploration and Oil Co., et al., Civil No. 2:96 CV 095 RL (N.D. Ind.).

**FOR PLAINTIFF THE UNITED STATES OF AMERICA:**

Date: 2-18-09

JOHN C. CRUDEN
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

STEVEN D. SHERMER
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611

DAVID CAPP
Interim United States Attorney
Northern District of Indiana

WAYNE AULT
Assistant United States Attorney
Northern District of Indiana
5400 Federal Plaza, Suite 1500
Hammond, IN 46320
(219) 937-5650

Subject to the notice and comment provisions of 28 C.F.R. § 50.7, THE UNDERSIGNED PARTIES enter into this Sixth Amendment to the Consent Decree entered in the matter of United States, et al., v. BP Exploration and Oil Co., et al., Civil No. 2:96 CV 095 RL (N.D. Ind.).

**FOR THE UNITED STATES**
**ENVIRONMENTAL PROTECTION AGENCY:**

Date: 1-27-09

CATHERINE R. McCABE
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
Washington, D.C. 20460

Date: 1-26-09

ADAM M. KUSHNER
Director, Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
Washington, D.C. 20460

Date: 1-21-09

JOHN FOGARTY
Senior Attorney, Air Enforcement Division
Office of Civil Enforceement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
Washington, D.C. 20460

Subject to the notice and comment provisions of 28 C.F.R. § 50.7, THE UNDERSIGNED PARTIES enter into this Sixth Amendment to the Consent Decree entered in the matter of United States, et al., v. BP Exploration and Oil Co., et al., Civil No. 2:96 CV 095 RL (N.D. Ind.).

**FOR THE UNITED STATES**
**ENVIRONMENTAL PROTECTION AGENCY,**
**REGION 6:**

Date: Dec 2, 2008

RICHARD E. GREENE
Regional Administrator
U.S. Environmental Protection Agency, Region 6
1445 Ross Ave.
Dallas, TX  75202-2733

114

THE UNDERSIGNED PARTIES enter into this Sixth Amendment to the Consent Decree entered in the matter of United States, et al., v. BP Exploration and Oil Co., et al., Civil No. 2:96 CV 095 RL (N.D. Ind.).

**FOR DEFENDANT BP PRODUCTS NORTH AMERICA INC.:**

Date: 1/5/09

KEITH M. CASEY
Vice President, BP Products North America Inc.
Business Unit Leader, Texas City Refinery
NOB/412
2401 5th Avenue South (P.O. Box 401)
Texas City, Texas  77590

Date: 1/7/09

KEVIN A. GAYNOR, ESQ.
Vinson & Elkins, L.L.P.

**ATTORNEYS FOR BP PRODUCTS NORTH AMERICA INC.**

115

## Appendix K:

### Cooling Tower Systems at the Texas City Facility Subject to the Cooling Tower Water Monitoring and Repair Program

The Cooling Tower Systems located at the following process units within the Texas City Facility are subject to the requirements of the Cooling Tower Water Monitoring and Repair Program set forth in Section IV, Paragraph 12 of the Sixth Amendment (sub-paragraph 19.W. of the Consent Decree, as amended):

| Cooling Tower Emission Point Number ("EPN") | Process Units Serviced | Type of Monitor(s) |
|---|---|---|
| 411 | • Alkylation Unit 2 ("Alky 2") | • El Paso |
| 422 | • Aromatics Recovery Unit ("ARU")<br>• Distillate Desulfurization Unit ("DDU")<br>• Ultraformer 4 ("UU4") | • El Paso |
| 420 | • Aromatics Unit 2 ("AU2") – Return Line<br>• Naptha Desulfurization Unit ("NDU")<br>• Isomerization Unit ("ISOM") | • El Paso |
| 412 | • Cokers | • El Paso |
| 413 | • Fluid Catalytic Cracking Unit 1 ("FCCU 1") | • HRVOC Gas Chromatograph<br>• El Paso |
| 415 | • Fluid Catalytic Cracking Unit 3 ("FCCU 3") | • HRVOC Gas Chromatograph<br>• El Paso |

116

| 417 | • Pipe Still 3A ("PS3A")<br>• Pipe Still 3B ("PS3B") | • HRVOC Gas Chromatograph and<br>• El Paso |
|---|---|---|
| 418 | • Ultracracker ("ULC") | • HRVOC Gas Chromatograph<br>• El Paso |
| 421 | • Ultraformer 3 ("UU 3") | • El Paso |
| 416 | • Power Station No. 3 ("Power 3") | • El Paso |

## Appendix L:

### Benzene Product Lines to Be Raised at the Texas City Facility

The following Benzene Product Lines shall be raised above ground as set forth in Section

IV, Paragraph 12 of the Sixth Amendment (sub-paragraph 19.BB. of the Consent Decree, as

amended):

|     | **Designation** | **Line No.** | **Total Feet** |
| --- | --- | --- | --- |
| 1. | Benzene | 729 | 200 |
| 2. | Benzene | 11 | 2,300 |
| 3. | Benzene | 94 | 800 |
| 4. | Off-spec. Benzene | 737 | 600 |
| 5. | Aromatics | 780 | 400 |
| 6. | Aromatics | 1516 (516) | 700 |
| 7. | Crude Benzene | 534, 534A | 600 |
| 8. | Crude Benzene | 541 | 300 |

## Appendix M:

### Installation of Geodomes on Texas City Facility Tanks

Geodome tank covers shall be installed upon the following tanks located at the Texas

City Facility as set forth in Section IV, Paragraph 12 of the Sixth Amendment (sub-paragraph

19.DD. of the Consent Decree, as amended):

1. Tank 101;

2. Tank 102;

3. Tank 520;

4. Tank 534; and

5. Tank 535

## Appendix N:

### IPR and Comfort Cooling Appliances Subject to CFC Compliance Measures

The following IPR and CCAs are subject to the CFC Compliance Measures required

under Section IV, Paragraph 13 of the Sixth Amendment (sub-paragraph 24-A of the Consent

Decree, as amended):

| Refinery Facility | General Location | Appliance Number | Type | Duty Type | Manufacturer | Model | Serial No. | Charge |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| BUILDING SERVICE | SECURITY - GATE 42 | ACU-1 (GATE 42) | Split System | Other Refrigeration | AAON | CA1184CA0502A AAP | 200410CCCE043 | 65 lbs 0.00 ozs |
| | | | | | | | | |
| BUILDING SERVICE | CHANGE HOUSE - CHANGEHOUSE | ACU-1 NORTH | Split System | Comfort Cooling | Technical System | 20A0CS20-S | 9-97-A42484-1 | 75 lbs 0.00 ozs |
| | | | | | | | | |
| BUILDING SERVICE | GOB - GOB | ACU-1 YORK (CIRCUIT # 1) | Chiller | Other Refrigeration | York | YCAS0130EC46XFA | RDKM000028 | 180 lbs 0.00 ozs |
| | | | | | | | | |
| BUILDING SERVICE | GOB - GOB | ACU-1 YORK (CIRCUIT #2) | Chiller | Other Refrigeration | York | YCAS0130EC46XFA | RDKM000028 | 180 lbs 0.00 ozs |
| | | | | | | | | |
| BUILDING SERVICE | SOB - ROOF TOP | ACU-1(ROOF TOP) OLD | Split System | Comfort Cooling | Carrier | 38AE016600 | W691135 | 65 lbs 0.00 ozs |
| | | | | | | | | |
| BUILDING SERVICE | SOB - ROOF TOP | ACU-2 (ROOF TOP) | Split System | Comfort Cooling | Carrier | 38AE016600 | W691156 | 65 lbs 0.00 ozs |
| | | | | | | | | |
| BUILDING SERVICE | CHANGE HOUSE - CHANGEHOUSE | ACU-2 MIDDLE | Split System | Comfort Cooling | Technical System | 20A0CS20-S | 9-97-A42484-2 | 75 lbs 0.00 ozs |
| | | | | | | | | |
| BUILDING SERVICE | SOB - ROOF TOP | ACU-3 (ROOF TOP) | Split System | Comfort Cooling | Carrier | 38AE-016-600 | W691155 | 65 lbs 5.00 ozs |
| | | | | | | | | |
| BUILDING SERVICE | CHANGE HOUSE - CHANGEHOUSE | ACU-3-SOUTH | Split System | Comfort Cooling | Technical System | 20A0CS20-S | 9-97-A42484-3 | 75 lbs 0.00 ozs |
| | | | | | | | | |
| BUILDING SERVICE | SOB - ROOF TOP | ACU-4 (SOUTH Y-2) | Split System | Comfort Cooling | Carrier | 38AE-016-600 | 43905384A6 | 65 lbs 0.00 ozs |
| | | | | | | | | |
| BUILDING SERVICE | SOB - ROOR TOP | ACU-5 (NORTH Y1) | Split System | Comfort Cooling | Carrier | 38AE-016-600 | 409CF38115 | 65 lbs 0.00 ozs |
| | | | | | | | | |
| BUILDING SERVICE | SOB - ROOF TOP | ACU-6 (SOUTH Y1) | Split System | Comfort Cooling | Carrier | 38AE-016-600 | 3390F30266 | 85 lbs 0.00 ozs |
| | | | | | | | | |
| BUILDING SERVICE | SOB - ROOF TOP | ACU-7 (SOUTH Y2) | Split System | Comfort Cooling | Carrier | 38AE-016-600 | 3390F30266 | 65 lbs 0.00 ozs |
| | | | | | | | | |

| BUILDING SERVICE | NOB - NOB ROOF TOP | CWU-1 East Unit (CKT #1) | Chiller | Other Refrigeration | Carrier | 30GTN110-631KA | 4594F21898 | 98 lbs 0.00 ozs |
|---|---|---|---|---|---|---|---|---|
| BUILDING SERVICE | NOB - NOB ROOF TOP | CWU-1 East Unit (CKT #2) | Chiller | Other Refrigeration | Carrier | 30GTN110-631KA | 4594F21898 | 105 lbs 0.00 ozs |
| BUILDING SERVICE | NOB - NOB ROOF TOP | CWU-2 Middle Unit (CRK #1) | Chiller | Other Refrigeration | Technical System | 30A0SD120 | 12-97-A43056 | 102 lbs 0.00 ozs |
| BUILDING SERVICE | NOB - NOB ROOF TOP | CWU-2 Middle Unit (CRK #2) | Chiller | Other Refrigeration | Technical System | 30A0SD120 | 12-97-A43056 | 102 lbs 0.00 ozs |
| BUILDING SERVICE | NOB - NOB ROOF TOP | CWU-3 West Unit (CRK #1) | Chiller | Other Refrigeration | Technical System | 30A0SD120 | 8-97-A41994 | 102 lbs 0.00 ozs |
| BUILDING SERVICE | NOB - NOB ROOF TOP | CWU-3 West Unit (CRK #2) | Chiller | Other Refrigeration | Technical System | 30A0SD120 | 8-97-A41994 | 102 lbs 0.00 ozs |
| BUILDING SERVICE | CRAFT-BLDG - CRAFT BLDG | PORTABLE UNIT (CIR #1) | Portable Unit | Other Refrigeration | Technical System | 30A0CHM150-S | 1-97-A392-44-2 | 120 lbs 0.00 ozs |
| BUILDING SERVICE | CRAFT-BLDG - CRAFT BLDG | PORTABLE UNIT (CIR #2) | Portable Unit | Other Refrigeration | Technical System | 30A0CHM150-S | 1-97-A392-44-2 | 120 lbs 0.00 ozs |
| BUILDING SERVICE | MEDICAL - MEDICAL | WCU-1 (MEDICAL) (CIR #1) | Chiller | Other Refrigeration | Carrier | 30GBO55630AA | T697995 | 65 lbs 0.00 ozs |
| BUILDING SERVICE | MEDICAL - MEDICAL | WCU-1 (MEDICAL) (CIR #2) | Chiller | Other Refrigeration | Carrier | 30GBO55630AA | T697995 | 71 lbs 0.00 ozs |
| CRACKING | FCCU-1 - K-4 S/G RM. | ACCU-1-K-4 (SW GEAR BLDG) | Split System | Other Refrigeration | Carrier | 09DK-028-601 | 4790F41654 | 65 lbs 0.00 ozs |
| CRACKING | FCCU-1 - CONTROL ROOM | ACU-1(CONTROL ROOM) | Split System | Comfort Cooling | Technical System | 20A0CD20-5 | 9-97-A42404 | 65 lbs 0.00 ozs |
| CRACKING | SRU - CONTROL ROOM | ACU-1(CONTROL ROOM) | Split System | Other Refrigeration | Carrier | 38AK-028-600 | 3390F30226 | 75 lbs 0.00 ozs |
| CRACKING | SRU - SOUR H2O SW.GEAR | ACU-1(SWITCHGEAR) | Split System | Other Refrigeration | Carrier | 38AKS028-600 | 5196F45870 | 75 lbs 0.00 ozs |
| CRACKING | SRU - SOUR H2O SW.GEAR | ACU-2 (SWITCHGEAR) | Split System | Other Refrigeration | Carrier | 38AKS028-600 | 3504f55310 | 75 lbs 0.00 ozs |
| CRACKING | FCCU-2 - CONTROL ROOM | ACU-2-(CONTROL ROOM) | Split System | Other Refrigeration | Carrier | 07EW033620 | N226404 | 75 lbs 0.00 ozs |
| CRACKING | FCCU-3 - CONTROL RM I/O RM | ACU-40-1 (I/O RM) (CIR #1) | Split System | Other Refrigeration | Trane | CAUBC40421903 | J57660706 | 60 lbs 0.00 ozs |
| CRACKING | FCCU-3 - CONTROL RM I/O RM | ACU-40-1 (I/O RM) (CIR #2) | Split System | Other Refrigeration | Trane | CAUBC40421903 | J57660706 | 60 lbs 0.00 ozs |

| CRACKING | FCCU-3 - CONTROL RM I/O RM EAST | ACU-40-2 (I/O RM) (CIR #1) | Split System | Other Refrigeration | Trane | CAUBC4042A131 | J876-81973 | 60 lbs 0.00 ozs |
|---|---|---|---|---|---|---|---|---|
| CRACKING | FCCU-3 - CONTROL RM I/O RM EAST | ACU-40-2 (I/O RM) (CIR #2) | Split System | Other Refrigeration | Trane | CAUBC4042A131 | J876-81973 | 60 lbs 0.00 ozs |
| CRACKING | SRU - COMPUTER ROOM  EAST SIDE | ACU-4A (COM. ROOM) | Split System | Other Refrigeration | Carrier | 38AK-024-600 | 0593F322296 | 60 lbs 0.00 ozs |
| CRACKING | SRU - COMPUTER ROOM roof top | ACU-4B (COM. ROOM) | Split System | Other Refrigeration | Carrier | 38AK-024-600 | 0J93F322297 | 60 lbs 0.00 ozs |
| CRACKING | CDCC - CDCC | Chiller East Side (CIR #1) | Centrifigal Chiller | Comfort Cooling | Carrier | 30GXN135-A-6-KJ | 1705713156 | 195 lbs 0.00 ozs |
| CRACKING | CDCC - CDCC | Chiller East Side (CIR #2) | Centrifigal Chiller | Comfort Cooling | Carrier | 30GXN135-A-6-KJ | 1705713156 | 195 lbs 0.00 ozs |
| CRACKING | CDCC - EAST SIDE OF BLDG. | Chiller West Side (CIR #1) | Chiller | Comfort Cooling | York | YCA50140EC46X FAX | RFLM003479 | 190 lbs 0.00 ozs |
| CRACKING | CDCC - EAST SIDE OF BLDG. | Chiller West Side (CIR #2) | Chiller | Comfort Cooling | York | YCA50140EC46X FAX | RFLM003479 | 190 lbs 0.00 ozs |
| CRACKING | ALKY 2 - I/O BLDG | WCCU-10-1(I/O BLDG) | Split System | Other Refrigeration | Trane | CAUBC2041A13 | J88B80425 | 96 lbs 0.00 ozs |
| CRACKING | ALKY 2 - I/O BLDG | WCCU-10-2(I/O BLDG) | Split System | Other Refrigeration | Trane | CAUBC2041A13 | J88B80426 | 96 lbs 0.00 ozs |
| CRACKING | ALKY 2 - SWITCH HOUSE 4 | WCCU-SR-1(SW #4) | Split System | Other Refrigeration | Trane | CAUBC3041A13 | J88B80427 | 96 lbs 0.00 ozs |
| CRUDE | COKERS - CHANGE HOUSE | 54-1 (CON. RM.BATHOUSECH G HOUSE,SWGA) | Chiller | Other Refrigeration | Temtrol | 30HS090-E610 | 0894J071157 | 70 lbs 0.00 ozs |
| CRUDE | RESID - 120 SW.GEAR BLDG | ACCU # 1 (120 SWG BLDG) | Chiller | Other Refrigeration | Technical System | 10A0136-33 | 05-99-050261-002 | 275 lbs 0.00 ozs |
| CRUDE | RESID - 120 SW.GEAR BLDG | ACCU # 2  (120 SWG BLDG) | Centrifigal Chiller | Other Refrigeration | Technical System | 10A0136-33 | 05-99-050261-001-001 | 275 lbs 0.00 ozs |
| CRUDE | COKERS - COKER  I / O RM | ACCU #2 (I/O RM) (CIR #1) | Split System | Other Refrigeration | Technical System | 20A0CD50-SS | 1-98A43328-2 | 75 lbs 0.00 ozs |
| CRUDE | COKERS - COKER  I / O RM | ACCU#2 (I/O RM) (CIR #2) | Split System | Other Refrigeration | Technical System | 20A0CD50-SS | 1-98A43328-2 | 75 lbs 0.00 ozs |
| CRUDE | COKERS - COKER  I / O RM | ACCU-1 (I/O RM) ( CIR #1) | Split System | Other Refrigeration | Technical System | 20A0CD50-SS | 1-98-A43328-1 | 75 lbs 0.00 ozs |
| CRUDE | COKERS - COKER  I / O RM | ACCU-1 (I/O RM) ( CIR #2) | Split System | Other Refrigeration | Technical System | 20A0CD50-SS | 1-98-A43328-1 | 75 lbs 0.00 ozs |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CRUDE | COKERS - CHANGE HOUSE | ACCU1-601K-1 (RDU) | Split System | Other Refrigeration | Carrier | 38AK028-600 | 0992F88392 | 62 lbs 5.00 ozs |
| CRUDE | COKERS - I/O BLDG | ACCU-2 (I/O BUILD) | Split System | Comfort Cooling | Technical System | 20A0CD50-SS | 1-98A43328-2 | 90 lbs 0.00 ozs |
| CRUDE | RESID - 120 SW.GEAR(EAST) | ACU -#1 (120 SWG EAST) | Split System | Other Refrigeration | Carrier | 38AK-034-600 | 3791F72917 | 75 lbs 0.00 ozs |
| CRUDE | PS3A & 3B - I/O ROOM ROOF | ACU-1 (I/O ROOF) | Split System | Other Refrigeration | Carrier | 09DK064601 | 1905Q06094 | 180 lbs 0.00 ozs |
| CRUDE | RESID - 140 SW.GEAR BLDG | ACU-10 (140 SWG) | Split System | Other Refrigeration | Temtrol | WF-AV30 | 71015 | 90 lbs 0.00 ozs |
| CRUDE | PS3A & 3B - 405K SW GR | ACU-1A (WEST405K) | Split System | Other Refrigeration | Technical System | 20A0CS30S | 10-96-A38737 | 75 lbs 0.00 ozs |
| CRUDE | PS3A & 3B - 405K SW GR | ACU-1B (EAST405K) | Split System | Other Refrigeration | Technical System | 20A0CS30S | 9-97-A42401 | 75 lbs 0.00 ozs |
| CRUDE | PS3A & 3B - I/O ROOM ROOF | ACU-2 (I/O ROOF) | Split System | Other Refrigeration | Carrier | 09DK064601 | 1605Q06030 | 180 lbs 0.00 ozs |
| CRUDE | CFHU - CFHT COMPLEX (EAST) | ACU-51-1 (PSCC) | Reciprocating | Other Refrigeration | Trane | RWRBC504RBN RG30ADFGMP | L85D27431 | 100 lbs 0.00 ozs |
| CRUDE | CFHU - CFHT COMPLEX (EAST) | ACU-51-2 (PSCC) | Reciprocating | Other Refrigeration | Trane | RWRBC504RBN RG30ADFGMP | L85D27432 | 100 lbs 0.00 ozs |
| CRUDE | HRU - HRU | HRU Process Chiller | Process Chiller | Industrial Process | York | MRP6582666 | M538AL | 34000 lbs 0.00 ozs |
| CRUDE | CFHU - CONTROL ROOM (WEST SIDE) | RCU-1 (COMPLEX) (CIR #1) | Split System | Other Refrigeration | Carrier | 38AH-094-6 | 0705F06702 | 135 lbs 0.00 ozs |
| CRUDE | CFHU - CONTROL ROOM (WEST SIDE) | RCU-1 (COMPLEX) (CIR#2) | Split System | Other Refrigeration | Carrier | 38AH-094-6 | 0705F06702 | 135 lbs 0.00 ozs |
| CRUDE | CFHU - CONTROL ROOM (WEST SIDE) | RCU-2 (COMPLEX) | Split System | Other Refrigeration | Carrier | 09DE146-600 | U699838 | 270 lbs 0.00 ozs |
| CRUDE | CFHU - CONTROL ROOM (WEST SIDE) | RCU-3 (COMPLEX) (CIR #1) | Split System | Other Refrigeration | Carrier | 38AH-094-601 | 3104F48831 | 135 lbs 0.00 ozs |
| CRUDE | CFHU - CONTROL ROOM (WEST SIDE) | RCU-3 (COMPLEX) (CIR #2) | Split System | Other Refrigeration | Carrier | 38AH-094-601 | 3104F48831 | 135 lbs 0.00 ozs |
| LAB (A.T.L.S.) | LAB - MACHINE ROOM 1st FLOOR | CHILLER #1 | Chiller | Other Refrigeration | Carrier | 303HR-195-F610 | 0795F34150 | 260 lbs 0.00 ozs |
| LAB (A.T.L.S.) | LAB - MACHINE ROOM 1st | CHILLER #2 | Chiller | Other Refrigeration | Carrier | 303HR-195-F-610 | 0695F33028 | 260 lbs 0.00 ozs |

| | FLOOR | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| LAB (A.T.L.S.) | LAB - MACHINERY ROOM 1st FLOOR | CHILLER #3 | Chiller | Other Refrigeration | Carrier | 303HR-195-F610 | 0495F30668 | 260 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | OMCC WEST - LOAD CENTER 39 | ACC-1 (LC-39) OMCCWEST | Compressor Rack | Other Refrigeration | Carrier | 06EV022-620 | 4340J01451 | 55 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | OMCC WEST - LOAD CENTER 39 | ACC-2 (LC 39) OMCCWEST | Compressor Rack | Other Refrigeration | Carrier | 06EV022-620 | 4340J01446 | 55 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | OMCC ANALYTICAL LAB - MECHANICAL ROOM | ACC-2 (North Unit) (CIR #1) | Chiller | Other Refrigeration | Technical System | 30A0CD75 | 01-99-050122-001-001 | 63 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | OMCC ANALYTICAL LAB - MECHANICAL ROOM | ACC-2 (North Unit) (CIR #2) | Chiller | Other Refrigeration | Technical System | 30A0CD75 | 01-99-050122-001-001 | 64 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | OMCC WEST - LOAD CENTER 39 | ACC-3 (LC 39) OMCCWEST | Compressor Rack | Other Refrigeration | Carrier | 06EV022-620 | Y290J01772 | 55 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | OMCC WEST - LOAD CENTER 39 | ACC-4 (LC 39) OMCC WEST | Compressor Rack | Other Refrigeration | Carrier | 06EV022-620 | 1A90J00780 | 55 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | ENVF - LOAD CENTER 45A | ACU-1 (LOAD CENTER 45A) | Split System | Other Refrigeration | Custom Air | ACC-26 | ACC-0051 | 52 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | OMCC EAST - LC 25 | ACU-1 (LC-25C) (CIR #1) OM EAST | Split System | Other Refrigeration | Carrier | WFSBP17 | 66870 | 60 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | OMCC EAST - LC 25 | ACU-1 (LC-25C) (CIR #2) OM EAST | Split System | Other Refrigeration | Carrier | WFSBP17 | 66870 | 60 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | ENVF - Load Center 36 | ACU-1 (LOAD CENTER 36) | Split System | Other Refrigeration | Technical System | HFC-14 | 5-97-A41356 | 65 lbs 0.00 ozs |

| OIL MOVEMENT DIVISION | ANALYZER BLDG (OFFICES) - ANALATICAL BLDG OFFICES | ACU-1 | Split System | Comfort Cooling | CUSTOM-AIR | ACC-32 | 0208-H-001 | 60 lbs 0.00 ozs |
|---|---|---|---|---|---|---|---|---|
| OIL MOVEMENT DIVISION | OMCC WEST - LOAD CENTER 39 | ACU-LC-39-3 | Split System | Other Refrigeration | Thermal | PF-2500-V | 6-6515-04 | 60 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | ENVF - LC # 42 | RC-42-1A (LOAD CENTER 42) | Split System | Other Refrigeration | Carrier | 06EW027-630 | 3590J01166 | 75 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | ENVF - LC # 42 | RC-42-1B (LOAD CENTER 42) | Split System | Other Refrigeration | Carrier | 06EW027-630 | 4891J03525 | 75 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | ENVF - LC # 42 | RC-42-2A (LOAD CENTER 42) | Compressor Rack | Other Refrigeration | Carrier | 06EW027-630 | 3891J031012A | 75 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | ENVF - LC # 42 | RC-42-2B (LOAD CENTER 42) | Split System | Other Refrigeration | Carrier | 06EW027-630 | 4691J03449 | 75 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | OMCC CONTROL CENTER - CONTROL RM BLDG | WC-56-1 (Roof E.Unit) (Cir #1) | Chiller | Other Refrigeration | Carrier | 30GB-060-6 | 2090F16609 | 56 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | OMCC CONTROL CENTER - | WC-56-1 (Roof E.Unit) (Cir #2) | Chiller | Other Refrigeration | Carrier | 30GB-060-6 | 2090F16609 | 56 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | OMCC CONTROL CENTER - CONTROL RM BLDG | WC-56-2 (Con. Rm) (CIR #1) | Chiller | Other Refrigeration | Carrier | 30GTN060-E631KA | 3904F60753 | 52 lbs 0.00 ozs |
| OIL MOVEMENT DIVISION | OMCC CONTROL CENTER - CONTROL RM BLDG | WC-56-2 (Con. Rm) (CIR #2) | Chiller | Other Refrigeration | Carrier | 30GTN060-E631KA | 3904F60753 | 54 lbs 0.00 ozs |
| PLANT GENERAL | WAREHOUSE - MAIN WAREHOUSE | # 1 Chiller (main whs) (Cir #4) | Chiller | Comfort Cooling | Technical System | 30A0SM200-S | 10-97-A42850-1 | 106 lbs 0.00 ozs |
| PLANT GENERAL | WAREHOUSE - MAIN WAREHOUSE | # 1Chiller (main whs) (Cir #1) | Chiller | Comfort Cooling | Technical System | 30A0SM200-S | 10-97-A42850-1 | 106 lbs 0.00 ozs |
| PLANT GENERAL | WAREHOUSE - MAIN | # 1Chiller (main whs) (Cir #2) | Chiller | Comfort Cooling | Technical System | 30A0SM200-S | 10-97-A42850-1 | 106 lbs 0.00 ozs |

| | WAREHOUSE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| PLANT GENERAL | WAREHOUSE - MAIN WAREHOUSE | # 1Chiller (main whs) (Cir #3) | Chiller | Comfort Cooling | Technical System | 30A0SM200-S | 10-97-A42850-1 | 106 lbs 0.00 ozs |
| PLANT GENERAL | MACHINE SHOP - MACH SHOP | ACCU-3 (WHSE) (CIR #1) | Chiller | Comfort Cooling | Technical System | 30AOSM200-S | 10-97-A42850-1 | 106 lbs 0.00 ozs |
| PLANT GENERAL | MACHINE SHOP - MACH SHOP | ACCU-3 (WHSE) (CIR #2) | Chiller | Comfort Cooling | Technical System | 30AOSM200-S | 10-97-A42850-1 | 106 lbs 0.00 ozs |
| PLANT GENERAL | MACHINE SHOP - MACH SHOP | ACCU-3 (WHSE) (CIR #3) | Chiller | Comfort Cooling | Technical System | 30AOSM200-S | 10-97-A42850-1 | 106 lbs 0.00 ozs |
| PLANT GENERAL | MACHINE SHOP - MACH SHOP | ACCU-3 (WHSE) (CIR #4) | Chiller | Comfort Cooling | Technical System | 30AOSM200-S | 10-97-A42850-1 | 106 lbs 0.00 ozs |
| REFORMING | DDU - 300 NORTH SW.GEAR | ACCU 1A (300 SWG) | Split System | Other Refrigeration | Carrier | 06EV022-620 | 2491502653 | 120 lbs 0.00 ozs |
| REFORMING | DDU - 300 SW.GR | ACCU 1B (300 SWG) | Split System | Other Refrigeration | Carrier | 06EV022-620 | 1991J02425 | 120 lbs 0.00 ozs |
| REFORMING | UU4 - MAIN SW.GEAR ROOM | ACU #1 (MAIN SWG) | Split System | Other Refrigeration | Technical System | 200ACS25 | 5-97-A41102-2 | 75 lbs 0.00 ozs |
| REFORMING | UU4 - MAIN SWITCHGEAR | ACU #2 (MAIN SWG) | Split System | Other Refrigeration | Technical System | 20A0CS25 | 5-97-A41102-1 | 75 lbs 0.00 ozs |
| REFORMING | ULC - MAIN SW. GEAR | ACU-1 (MAIN SW GEAR) | Split System | Appliance Under 50 Lbs | Carrier | 38AKS024-600 | 4094F16715 | 50 lbs 0.00 ozs |
| REFORMING | ARU - MAIN SW. GEAR RM . | ACU-2 ( WEST SW.GEAR RM. ) | Split System | Other Refrigeration | Carrier | 38AKS024-610 | 1396F98274 | 50 lbs 0.00 ozs |
| REFORMING | ULC - MAIN SW. GEAR | ACU-2 (MAIN SW.GEAR) | Split System | Other Refrigeration | Carrier | 38AKS024-600 | 4094F16716 | 50 lbs 0.00 ozs |
| REFORMING | AU2 - COOLING TOWER SG. | ACU-2 COOLING TOWER SWG | Package | Other Refrigeration | Carrier | 50SS-060-301 | 3894G40034 | 90 lbs 0.00 ozs |
| REFORMING | ARU - ARU CONTROL ROOM | WCCU 53-1 ( CONT. ROOM ) | Water Cooled Chiller | Other Refrigeration | Nance | NWCC-080 | WCCU53-1 | 200 lbs 0.00 ozs |
| REFORMING | ARU - ARU C/R | WCCU 53-2 ( CONT. ROOM ) | Water Cooler | Other Refrigeration | Nance | NWCC-080 | WCCU-53-2 | 200 lbs 0.00 ozs |
| UTILITIES | PRST2 - WATER TREATMENT CON. RM | ACCU-1A (WTP CONTROL ROOM) | Split System | Other Refrigeration | Temtrol | AV22 | 54633 | 80 lbs 0.00 ozs |
| UTILITIES | PRST2 - WATER TREATMENT CON. RM | ACCU-1B (WTP CONTROL ROOM) | Split System | Other Refrigeration | Temtrol | AV-22 | 54635 | 80 lbs 0.00 ozs |

| UTILITIES | PRST2 - WATER TREATMENT CON. RM | ACCU-2A (WTP CONTROL ROOM) | Split System | Other Refrigeration | Temtrol | AV 22 | 54636 | 80 lbs 0.00 ozs |
|---|---|---|---|---|---|---|---|---|
| UTILITIES | PRST2 - WATER TREATMENT CON. RM | ACCU-2B (WTP CONROL ROOM) | Split System | Other Refrigeration | Temtrol | AV-22 | 54634 | 80 lbs 0.00 ozs |
| UTILITIES | OUSE - NORTHSIDE OF SWITCH HOUSE | ACU #1 ( NO.SIDE OF SWH  2) | Split System | Other Refrigeration | Custom Air | ACC19 | 0214-B-001 | 60 lbs 0.00 ozs |
| UTILITIES | OUSE - NORTHSIDE OF SWITCH HOUSE | ACU #2 ( NO. SIDE OF SWH ) | Split System | Other Refrigeration | Custom Air | ACC19 | 0214-H-002 | 60 lbs 0.00 ozs |
| UTILITIES | PRST2 - P 201 BLDG. | ACU -1 (P 201 BLDG) | Split System | Other Refrigeration | Temtrol | AV 22 | 57801 | 60 lbs 0.00 ozs |
| UTILITIES | OUSE - SWITCHHOUSE #2 ROOF TOP | ACU 2B (SWH #2 Roof Top) | Split System | Other Refrigeration | Trane | CAUCC2041M03 2 | C06F05497 | 90 lbs 0.00 ozs |
| UTILITIES | OUSE - LOAD CENTER 39 | ACU-1 ( LC-39 ) | Split System | Other Refrigeration | Thermal | PF-2500-V | 6-6515-03 | 80 lbs 0.00 ozs |
| UTILITIES | OUSE - SWITCHHOUSE #2 ROOF TOP | ACU-1A (SWH #2 Roof Top) | Split System | Other Refrigeration | Trane | CAUCC2041M03 02 | C06F05498 | 90 lbs 0.00 ozs |
| UTILITIES | OUSE - SWITCHHOUSE #2 ROOF TOP | ACU1B (SWH #2 Roof Top) | Split System | Other Refrigeration | Trane | CAUCC2041m03 02 | C06F05496 | 90 lbs 0.00 ozs |
| UTILITIES | OUSE - LOAD CENTER 39 | ACU-2  (LC-39) | Split System | Other Refrigeration | Thermal | PF2500-V | 6-6515-04 | 80 lbs 0.00 ozs |
| UTILITIES | PRST2 - P 201 BLDG. | ACU-2 (P 201 BLDG) | Split System | Other Refrigeration | Temtrol | AV 22 | 57802 | 60 lbs 0.00 ozs |
| UTILITIES | OUSE - SWITCHHOUSE #2 ROOF TOP | ACU-2A  (SWH #2) | Split System | Other Refrigeration | Trane | CAUCC2041M03 02 | C06F05499 | 90 lbs 0.00 ozs |
| UTILITIES | OUSE - LOAD CENTER 39 | ACU-3  LC-39 | Split System | Other Refrigeration | Thermal | PF-2500-V | 6-6515-05 | 80 lbs 0.00 ozs |
| UTILITIES | OUSE - LOAD CENTER 39 | ACU-4  LC-39 | Split System | Other Refrigeration | Thermal | PF-2500-V | 6-6515-06 | 80 lbs 0.00 ozs |
| | | | | | | | | |

## Appendix O:

## Natural Gas Conversion Supplemental Environmental Project

BP Products shall perform a Supplemental Environmental Project ("SEP") entitled the Natural Gas Conversion SEP in accordance with Section VII.A. of the Consent Decree, as amended, and the following workplan and schedule:





# Appendix P:

## Dry Weather Sump Reliability Project Scope

| Unit | Existing Pump/Level Control | Pump Project Modification Details | Level Control Modification Details |
|---|---|---|---|
| ULC East | 1 Progressing Cavity Pump | Add one centrifugal pump, operate in parallel with progressing cavity pump | Upgrade to Radar |
| ULC West | 1 Progressing Cavity Pump | No pump change | Upgrade to Radar |
| RHU East | 2 Progressing Cavity Pumps | Second progressing cavity pump operates as a spare | Upgrade to Radar |
| RHU West | 2 Progressing Cavity Pumps | Second progressing cavity pump operates as a spare | Upgrade to Radar |
| CFHU | 1 Progressing Cavity Pump | No pump change | Upgrade to Radar |
| DDU | 1 Progressing Cavity Pump | No pump change | Upgrade to Radar |
| PS 3A | 2 Centrifugals | No pump change | Upgrade to Radar |
| PS 3B | 2 Progressing Cavity Pumps | Replace one progressing cavity pump with a centrifugal | Upgrade to Radar |
| PS 3B Proto | 1 Progressing Cavity Pump | Add one centrifugal pump | Upgrade to Radar |
| FCU 3 South | 2 Progressing Cavity Pumps | Replace one progressing cavity pump with a centrifugal | Upgrade to Radar |
| FCU 3 North | 1 Centrifugal pump | Replace the centrifugal with another centrifugal | Upgrade to radar |
| AU2 | 1 Progressing Cavity Pump, radar level | No changes | No changes |
| ARU | 1 Progressing Cavity Pump | Add 1 centrifugal to operate in parallel with progressing cavity pump | Upgrade Radar |
| UU4 | 1 Progressing Cavity Pump | Add 1 centrifugal to operate in parallel with progressing cavity pump | Upgrade Radar |
| Env Facility LS 1 | 2 Progressing Cavity Pumps | No pump modifications | Upgrade to Radar |
| Env Facility LS 3 | 2 Progressing Cavity Pumps | No pump modifications | Upgrade to Radar |

| | | | |
|---|---|---|---|
| **UU3 East** | 1 Progressing Cavity Pump | No pump modifications | Upgrade to Radar |
| **UU3 West** | 1 Progressing Cavity Pump | No pump modifications | Upgrade to Radar |
| **RDU** | 1 Progressing Cavity Pump | No pump modifications | Upgrade to Radar |
| **Coker** | 1 Centrifugal pump | Add 2nd centrifugal pump | Upgrade to Radar |
| **FCU 1** | 1 Centrifugal pump, Radar level | No changes | No changes |
| **OMCC** | No dry weather sump | NA | NA |